JAMES M. CARLSON (IL Bar No. 6269506)
Email: carlsonja@sec.gov
JAMES E. SMITH (DC Bar No. 482985)
Email: smithja@sec.gov
Securities and Exchange Commission
100 F. Street, NE
Washington, DC 20549
Carlson Telephone: 202-551-3711
Smith Telephone: 202-551-5281
Facsimile: 703-813-9314

Attorneys for Plaintiff
Securities and Exchange Commission

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>        vs.<br><br>CORNERSTONE ACQUISITION AND MANAGEMENT COMPANY LLC, DERREN L. GEIGER, and SHE HWEA NGO,<br><br>                    Defendants. | Case No.   '22CV0765 JLS  WVG<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Securities and Exchange Commission ("SEC" or the "Commission") alleges:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b),77t(d) and 77v(a)], Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa], and Sections 209(d), 209(e), and 214 of the Investment Advisers Act of 1940 ("Advisers Act")

[15 U.S.C. §§ 80b-9(d), 80b-9(e), 80b-14], and 28 U.S.C. § 1331.

2.     Among other things, the Defendants conducted investment adviser activities and engaged in the unlawful acts described herein throughout the United States using, directly or indirectly, the means, instruments, or instrumentalities of interstate commerce and/or the mails, including email, the internet, and telephone.

3.     Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

4.     In particular, Defendants Derren L. Geiger ("Geiger") and She Hwea Ngo ("Ngo") reside in Del Mar, California and Cornerstone's principal place of business is in Rancho Santa Fe, California.  Also, during the time period of the allegations, the Defendants conducted their business from the District.

## SUMMARY

5.     This case involves an investment adviser and its officers' fraudulent scheme and series of misrepresentations and omissions to investors and prospective investors in two private funds as well as the adviser's related compliance and recordkeeping failures.  The scheme, among other things, sought to retain and placate the funds' investors with materially false information as well as fraudulently entice new investors.  In committing these acts and making these misrepresentations and omissions, the investment adviser and its officers acted with at least extreme recklessness.

6.     From April 2011 through at least November 2021 (the "Relevant Period"), then-registered investment adviser Cornerstone Acquisition and Management Company LLC ("Cornerstone"), its CEO, portfolio manager, and chief compliance officer, Geiger, and its CFO, Ngo (collectively, the "Defendants"), made false and misleading statements and committed other deceptive acts in furtherance of a fraudulent scheme to deceive and defraud investors in two private funds.

///

7.     The first fund, the Caritas Royalty Fund LLC ("U.S. Fund"), is a fund for U.S. investors.  Cornerstone advised the U.S. Fund.  The second fund, the Caritas Royalties Fund (Bermuda) Ltd. ("Bermuda Fund"), is a fund for U.S. tax-exempt and non-U.S. investors.  Cornerstone sub-advised the Bermuda Fund.

8.     To solicit and retain investors for the Bermuda Fund, Defendants made, drafted, and/or disseminated materially false and misleading statements, which fundamentally mischaracterized the nature and risks of an investment in the fund.

9.     First, the Defendants falsely stated that certain promissory notes – the Bermuda Fund's only investment assets – were secured by collateral.  In fact, they were not.  Defendants made these misstatements in the Bermuda Fund's audited financial statements and prospectus, and in other communications with prospective and existing investors.

10.    Second, Defendants stated that the value of the promissory notes was not contingent upon the profits and losses of the obligor's underlying assets.  This was also false.  In fact, the value was directly contingent upon those profits and losses.  Defendants made these misstatements to prospective and existing investors in the Bermuda Fund's prospectus and due diligence questionnaires.

11.    Throughout their scheme, the Defendants committed deceptive acts to further their fraud and evade detection regarding their misrepresentations about the Bermuda Fund:

- They prepared and signed promissory notes containing a sham provision falsely stating that the notes were secured by collateral, and sent the notes to the Bermuda Fund's independent auditor (the "Audit Firm");

- They disseminated legal opinion letters to prospective and existing investors and to the Audit Firm that falsely asserted that the notes were collateralized;

- They falsely asserted that the notes were secured by collateral in other communications with the Audit Firm; and

- They also asserted that the notes were secured by collateral in a written submission to Commission staff, who were conducting an examination of Cornerstone.

12.     With regard to both the U.S. and Bermuda Funds, the Defendants, in a further effort to solicit and retain investors, falsely stated in communications with investors, and in reports that Cornerstone filed with the Commission, that Geiger was Cornerstone's sole owner.  This was false.

13.     In fact, on February 28, 2018, Geiger and Ngo each acquired a fifty percent ownership interest in Cornerstone from the estate of the former sole owner (the "Prior Owner").  When investors asked questions and expressed concerns about Cornerstone's future ownership after the Prior Owner's death, Geiger represented that he was negotiating to acquire Cornerstone, and made no mention of Ngo.  He did this because Geiger was the Cornerstone executive best known to the investor base.  After Geiger and Ngo acquired Cornerstone, the Defendants continued falsely to hold Geiger out as Cornerstone's sole owner.

14.     Ultimately, Cornerstone earned more than $3.3 million in asset-based management fees from the Bermuda Fund alone during the course of Defendants' scheme.

15.     The Defendants also failed to maintain proper compliance policies and procedures and accurate books and records as required by the Advisers Act.  For example:

- Prior to the first quarter of 2020, Cornerstone and Geiger failed to make and implement any written compliance policies and procedures in order to determine the promissory notes' interest rates and principal amounts;

- Cornerstone also lacked written policies and procedures concerning its provision of undocumented and undisclosed short-term loans to American Assurance 2000, LP ("American Assurance"), another private fund advised by Cornerstone; and

- Finally, Cornerstone and Ngo recorded inaccurate transactions in Cornerstone's general ledger concerning Geiger's and Ngo's February 2018 acquisition of Cornerstone.  Cornerstone subsequently produced this to Commission staff in the course of their examination of the firm.

///

///

///

COMPLAINT                                          4

## VIOLATIONS AND RELIEF SOUGHT

16.     By engaging in the above-described misconduct (a) each Defendant violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10-b5] thereunder; (b) Cornerstone and Geiger violated Advisers Act Sections 206(4) [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 [17 C.F.R. § 275.206(4)-8] thereunder and 207 [15 U.S.C. § 80b-7]; (c) Cornerstone violated Advisers Act Sections 204 [15 U.S.C. § 80b-4] and Rule 204-2 [17 C.F.R. § 275.204-2] thereunder and 206(4) and Rule 206(4)-7 [17 C.F.R. § 206(4)-7] thereunder; (d) Geiger aided and abetted violations of Advisers Act Section 206(4) and Rule 206(4)-7 thereunder; and (e) Ngo aided and abetted violations of Advisers Act Sections 204 and Rule 204-2 thereunder, 206(4) and Rule 206(4)-8 thereunder, and 207.

17.     The Commission seeks a judgment from the Court: (a) permanently enjoining the Defendants from engaging in future violations of the federal securities laws pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)]; (b) ordering Defendants to disgorge all ill-gotten gains received pursuant to Sections 21(d)(5), (7), and (8) of the Exchange Act [15 U.S.C. § 78u-(d)(5), (7) & (8)], together with prejudgment interest; and (c) ordering Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. §80b-9(e)].

## DEFENDANTS

18.     **Cornerstone Acquisition & Management Company LLC** is a Delaware limited liability company with its principal place of business in Rancho Santa Fe, California.  During the Relevant Period, Cornerstone was the investment adviser to the U.S. Fund and American Assurance and was the Bermuda Fund's sub-adviser.  It had fewer than ten employees.  Cornerstone also held all of American

Assurance's common equity.  Cornerstone was registered with the Commission as an investment adviser from January 2006 through March 2022.  According to Cornerstone's Forms ADV, filed with the Commission during the Relevant Period, Cornerstone's regulatory assets under management peaked at almost $131 million in 2015 and declined thereafter.

19.     **Derren Lee Geiger**, age 51, resides in Del Mar, California.  Geiger was Cornerstone's chief operating officer ("COO") from 2009 until March 2018, when he became Cornerstone's CEO.  Geiger also served as Cornerstone's only portfolio manager and chair of its investment committee since 2009.  In 2015, Geiger became Cornerstone's chief compliance officer ("CCO") with final responsibility for Cornerstone's compliance program.  He owns fifty percent of Cornerstone's capital. He is a Chartered Financial Analyst and a Chartered Alternative Investment Analyst and holds Financial Industry Regulatory Authority Series 3, 7, 24, and 63 licenses.

20.     **She Hwea ("Shea") Ngo**, age 46, resides in Del Mar, California.  Ngo joined Cornerstone in January 2014 as a controller and has been Cornerstone's CFO since 2015.  Ngo owns fifty percent of Cornerstone's capital.  She is a licensed California CPA and had eight years' experience auditing private funds prior to joining Cornerstone.

## OTHER RELEVANT ENTITIES

21.     **American Assurance 2000, LP** ("American Assurance") is an unregistered fund organized as a Delaware limited partnership.  American Assurance primarily invests in a portfolio of U.S. oil and natural gas royalty and other interests.

22.     **Caritas Royalty Fund, LLC** ("U.S. Fund") is an unregistered fund organized as a Delaware limited liability company for U.S. investors.  During the Relevant Period, the U.S. Fund served as an onshore feeder fund for, and the general partner of, American Assurance, and held all of American Assurance's preferred equity.

///

23.     **Caritas Royalties Fund (Bermuda) Ltd.** ("Bermuda Fund") is an unregistered fund organized as an open-end mutual fund company under Bermuda law for U.S. tax exempt and non-U.S. investors.  During the Relevant Period, the Bermuda Fund invested in American Assurance through loans memorialized by promissory notes.

## STATEMENT OF FACTS

**I.     BACKGROUND**

**A.     Cornerstone and Its Funds**

24.     During the Relevant Period, Cornerstone was the investment adviser to American Assurance and the U.S. Fund and the sub-adviser to the Bermuda Fund, each of which was a "pooled investment vehicle" as defined in Section 206(4)-8(b) of the Advisers Act [17 C.F.R. § 275.206(4)-8(b)] because each would be an investment company under Section 3(a) of the Investment Company Act of 1940 [15 U.S.C. § 80a-3(a)] but for the exclusion provided by either Section 3(c)(1) or 3(c)(7) of that Act [15 U.S.C. § 80a-3(c)(1) & (7)].

25.     Cornerstone received asset-based management fees from the U.S. and the Bermuda Funds in exchange for providing investment advisory services to them.

26.     As Cornerstone's sole portfolio manager and chair of its investment committee, Geiger was also an investment adviser to American Assurance, the Bermuda Fund, and the U.S. Fund, and had primary or exclusive responsibility for making investment decisions for those funds.  Prior to March 2018, Geiger received compensation for providing investment advisory services that derived from Cornerstone's revenues, including Cornerstone's receipt of management fees from the U.S. Fund and the Bermuda Fund.  Thereafter, Geiger had a fifty percent ownership interest in Cornerstone.

27.     Throughout the Relevant Period, Defendants offered and sold limited partnership interests in the U.S. Fund and shares in the Bermuda Fund.  The limited partnership interests and shares were securities within the meaning of the federal

securities laws.

28.     Cornerstone's sub-advisory agreements with the investment adviser to the Bermuda Fund (the "Bermuda Adviser") provided that Cornerstone had "full discretion to make and execute all investment decisions" for the Bermuda Adviser relating to the Bermuda Fund.  Cornerstone arranged for the Bermuda Fund to invest in American Assurance through loans while the U.S. Fund invested in American Assurance's preferred equity.

29.     Defendants edited and/or reviewed and approved the Bermuda Fund's prospectuses, whose contents overlapped significantly with those of the U.S. Fund. Defendants also drafted, had authority over the contents of, and approved the distribution of the Bermuda Fund's due diligence questionnaires and other marketing materials.  Defendants made presentations to prospective and existing U.S. tax-exempt and non-U.S. investors.  Pursuant to the sub-advisory agreements, Cornerstone received 88% of the management fees collected from the Bermuda Fund and 100% of the performance fees.

**B.     The Bermuda Fund's Investments**

30.     During the Relevant Period, Cornerstone invested substantially all of the Bermuda Fund's capital in American Assurance through loans.  This enabled the Bermuda Fund to claim a "portfolio interest" tax exemption available to certain foreign lenders.  The loans were unsecured and were memorialized by promissory notes issued by American Assurance to the Bermuda Fund that reset at least semi-annually, with a new maturity date, principal amount, and interest rate at each new issuance.  The promissory notes constituted the Bermuda Fund's only investment assets.

31.     Cornerstone structured the promissory notes to provide the Bermuda Fund with equity-like returns through their interest rates.  Prior to November 2014, each of the promissory notes had a fixed interest rate of 2% per annum, and the fair value of each note was adjusted monthly based upon American Assurance's profits

and losses.  Thereafter, the promissory notes had variable interest rates based on forecasts of the cash flows that American Assurance's underlying assets would generate over the term of each note, and the fair value of each note was equal to its principal amount.

**C.    Bermuda Fund's Dwindling Subscriptions and the SEC Exam**

32.    Beginning in 2015, Cornerstone experienced difficulty in securing subscriptions to the Bermuda Fund from investors, some of whom had questions about the reasons why the Bermuda Fund invested in American Assurance through loans rather than through a more conventional tax-blocker structure.  The following table, which is based on records obtained from the Bermuda Fund's administrator, shows that investment in the Bermuda Fund steadily declined after 2014:

| Total Investment in the Bermuda Fund | |
| --- | --- |
| | |
| Quarter Ending in December | Investment (U.S. Dollars) |
| 2014 | $88,214,224 |
| 2015 | $73,705,309 |
| 2016 | $55,613,154 |
| 2017 | $40,671,178 |
| 2018 | $38,492,402 |
| 2019 | $37,881,922 |
| 2020 | $21,042,043 |

33.    In July 2019, the Commission initiated an examination of Cornerstone (the "Examination").  On February 18, 2020, Commission staff sent a letter to Geiger detailing its findings from the Examination and identifying deficiencies and weaknesses in Cornerstone's controls (the "SEC Deficiency Letter").  Geiger's March 25, 2020, response to the SEC Deficiency Letter, on behalf of Cornerstone, stated that Defendants would take certain corrective actions and appended certain

newly written compliance policies and procedures.

## II. DEFENDANTS MISREPRESENTED TO CURRENT AND PROSPECTIVE INVESTORS THAT THE BERMUDA FUND'S LOANS WERE COLLATERALIZED BY AMERICAN ASSURANCE'S INVESTMENTS

34.     Throughout the Relevant Period, Defendants made materially false and misleading statements to prospective and existing investors in the Bermuda Fund that the promissory notes were collateralized.  The "Notes to Financial Statements" for each of the Bermuda Fund's audited financial statements for the years ending December 2015 through 2018 stated:

> The fair value of the note receivable [the promissory notes] from American Assurance is derived from the fair value of the underlying investments of American Assurance and its wholly owned subsidiary, Cobra Petroleum Company, LP ("Cobra").  ***In addition, the fair value of the note receivable is influenced by the current market conditions surrounding the value of the underlying collateral.***

(emphasis added.)

35.     In contrast, the audited financial statements for the U.S. Fund, which owned all of American Assurance's preferred equity, described the same "note receivable" but said nothing about whether or not it was collateralized.

36.     The representations in the Bermuda Fund's audited financial statements were false because the promissory notes never had any "underlying collateral."  They were material because they concerned the Bermuda Fund's only investment assets and fundamentally mischaracterized the nature and risks of an investment in the Bermuda Fund.

37.     Each of the Bermuda Fund's audited financial statements for 2015 through 2018 were disseminated to all existing investors in the Bermuda Fund in or around the spring of the following year.  In addition, Cornerstone and Geiger sent copies of the audited financial statements to certain prospective investors.

38.     As a licensed CPA and Cornerstone's CFO, Ngo drafted both the preliminary and final versions of the audited financial statements in consultation with

Geiger.

39.     Further, Geiger and Ngo signed management representation letters to the Audit Firm in which they represented that the collateral for all of the Bermuda Fund's financial instruments had been "adequately accounted for and disclosed in accordance with the requirements of U.S. GAAP."

40.     The "Independent Auditor's Report," attached to each of the audited financial statements, stated that "Management is responsible for the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error."

41.     Geiger repeated the false statements about collateral in other communications to investors.  For example, in a June 9, 2016 email to prospective investors, Geiger wrote that "Offshore [the Bermuda Fund] has priority over Onshore [the U.S. Fund] due to Note being secured debt."

42.     This statement was false because the promissory notes were not secured debt.  In addition, it was false because American Assurance's Third Amended and Restated Agreement of Limited Partnership, dated March 13, 2013, provided that neither the U.S. Fund nor the Bermuda Fund would have priority over one another in the event of American Assurance's dissolution or termination.

43.     Similarly, on June 6, 2018, the Bermuda Adviser sent an email to Geiger and Ngo in which the Bermuda Adviser forwarded questions from a prospective investor in the Bermuda Fund.  Geiger wrote responses to the questions, which the Bermuda Adviser copied into an email reply to the prospective investor, and copied Geiger, on the same day.  In his response to one of the prospective investor's questions, Geiger wrote that "[t]he investment risks [of the U.S. Fund and the Bermuda Fund] are similar in that the Note is collateralized by the underlying oil and gas assets."  On June 14, 2018, the investor replied to the Bermuda Adviser and Geiger by ordering two initial subscriptions, totaling $500,000, to the Bermuda Fund.
///

44.     To evade detection, Defendants also repeated the false assertion about collateral to Commission staff during the Examination.  On October 22, 2019, Commission staff sent Cornerstone requests for information that included a request for a "written description of the collateral provided for the note" issued by American Assurance to the Bermuda Fund.  On November 4, 2019, Geiger and Ngo responded by writing that "[t]he underlying oil and gas assets held by [American Assurance] that are attributable to [the Bermuda Fund's] capital in the investment strategy is considered to be the collateral of the Note."

45.     On November 4, 2019, Ngo sent an email to the Audit Firm's lead engagement partner on the Bermuda Fund's audits and attached the false written submission to Commission staff concerning the promissory notes' purported collateral.  Three days earlier, on November 1, Geiger had sent an email, copying Ngo, notifying the lead engagement partner that he and Ngo had given Commission staff permission to speak with her and other Audit Firm personnel about the audits.

46.     Defendants knew, or were reckless or negligent in not knowing, that their representations that the promissory notes were collateralized by American Assurance's underlying assets were false and misleading.

47.     Geiger signed, and Ngo was responsible for updating, each of the two-page promissory notes, which contained no provision stating that they were secured by American Assurance's assets.  Geiger and Ngo were also responsible for negotiating the terms of American Assurance's credit facility agreements, which contained extensive provisions about collateral; they were familiar with that term and what it meant.

48.     Nor were these misrepresentations haphazard: Defendants made these misrepresentations in the audited financial statements for the Bermuda Fund.  A reasonable investor would have wanted to know that the Bermuda Fund's only investment assets were, in fact, unsecured when making an investment decision about the Fund.  Defendants did not repeat these misrepresentations (omitting to say

anything about collateral) in the audited financial statements for the U.S. Fund, which owned all of American Assurance's preferred equity, and whose investors potentially could have been harmed by the existence of such collateral.

## III. DEFENDANTS MISREPRESENTED THAT BERMUDA FUND'S LOANS WERE COLLATERALIZED BY CORNERSTONE'S MEMBERSHIP OR AMERICAN ASSURANCE OWNERSHIP INTERESTS

### A.    Misrepresentations in the Fund Prospectuses and Promissory Notes

49.    For many years, Defendants also made false and misleading statements that the promissory notes were collateralized by Cornerstone's membership or ownership interests in American Assurance.  The April 2011 prospectus for the Bermuda Fund, which was in use until it was updated in September 2013, included the following statement in its description of the promissory notes:

> [T]here will be sufficient security for the debt (i.e. the membership interests in the Owner [American Assurance] will be pledged as collateral for the [Bermuda] Fund loans).

50.    Similarly, each of the two-page promissory notes from April 2011 through January 2013, and from November 2014 through February 2018, provided that:

> This note is secured by that certain Assignment and Pledge of Ownership Interests of even date herewith by and among Cornerstone Acquisition & Management Company LLC, as Pledger, and the Payee [the Bermuda Fund] as the Secured Party.

51.    In fact, the promissory notes were never secured by Cornerstone's membership or ownership interests in American Assurance, by an "Assignment and Pledge of Ownership Interests," or by any other collateral.

52.    Geiger was the sole signatory on each of these promissory notes.  After joining Cornerstone in January 2014, Ngo was responsible for updating each of the notes.  From April 2011 through June 2014, the Bermuda Fund's prospectuses stated that the promissory notes were available for inspection at Cornerstone's offices.

///

COMPLAINT                                                13

53.     In December 2012, Cornerstone's outside counsel asked Geiger to provide them with a copy of the "Assignment and Pledge of Ownership Interests" ("Assignment/Pledge Document") referenced in the promissory notes.  On or about March 8, 2013, Geiger sent an email to the lawyers in which he wrote that he was unable to locate an executed version.

54.     Cornerstone's counsel removed the reference to security and collateral for the promissory notes from the Bermuda Fund's prospectuses beginning in September 2013, and Geiger directed a Cornerstone employee to delete the paragraph referencing the Assignment/Pledge Document from Cornerstone's template for the promissory notes.  The relevant correspondence between Geiger and the lawyers was forwarded to Ngo when she joined Cornerstone in January 2014.

55.     Nonetheless, beginning in November 2014, Geiger and Ngo reinserted the false provision concerning the Assignment/Pledge Document into the text of the promissory notes, where it remained for more than four years until it was finally removed in June 2018.  During that period, the Assignment/Pledge document remained unexecuted and the notes continued to be unsecured.

**B.     The Misrepresentations in the Legal Opinion Letter**

56.     In July 2016, Cornerstone's outside counsel updated a March 2011 legal opinion letter that it had sent to Geiger concerning the Bermuda Fund's eligibility for the "portfolio interest" tax exemption.  Both the March 2011 and July 2016 legal opinion letters stated that, based upon information provided by Cornerstone, "there will be sufficient security for the debt (i.e., the membership interests in [American Assurance] will be pledged as collateral for the loan)."  Both letters also stated that the existence of collateral was relevant to an analysis of whether the Bermuda Fund's loans qualified for the exemption.

57.     Cornerstone and Geiger made both opinion letters available to prospective and existing investors in the Bermuda Fund upon request.  Geiger personally sent the opinion letters to certain prospective and existing investors.  In

addition, Defendants provided the opinion letters to the Audit Firm which incorporated them into its audit work papers for the Bermuda Fund.

58.     By disseminating the opinion letters, the Defendants falsely communicated that the promissory notes were collateralized.

59.     Defendants knew that the statements about collateral in the promissory notes and the legal opinion letters were false, or they were reckless or negligent in making, drafting, and/or disseminating them without determining whether they were true or false.  Similarly, Geiger knew that the statement about collateral in the April 2011 prospectus was false, or he was reckless or negligent in drafting, approving, and/or disseminating it without determining whether it was true or false.

## IV.     DEFENDANTS MISREPRESENTED THE VALUE PROPOSITION FOR THE PROMISSORY NOTES

60.     The Defendants also drafted and/or disseminated materially false and misleading statements to investors about the value proposition for the promissory notes.

61.     Beginning in January 2015, each prospectus for the Bermuda Fund included the following statement in both the "Summary" and the "Fund Investment Structure" sections under the heading "Current Investment Structure":

> The Fund invests in [American Assurance] through an Investment Structure that utilizes a combination of equity and debt, including Fund Loans whose value is not contingent upon profits and losses related to the Royalty and Non-Operated Working Interests and other assets (if any) owned by [American Assurance].

The July 2014 prospectus for the Bermuda Fund, which Cornerstone emailed to all existing investors in the Bermuda Fund, contained essentially the same statement under the heading "Current and Future Investment Structure."

62.     From 2016 through 2019, each of the due diligence questionnaires for the Bermuda Fund also contained essentially the same statement in a section entitled "Investment Structure."

///

COMPLAINT                                                    15

63. The statement is false because the value of the promissory notes was directly contingent upon the profits and losses of American Assurance's assets. Since November 2014, Geiger and Ngo determined the promissory notes' interest rates by forecasting the cash flow that would be generated by American Assurance's underlying assets over the term of each note, and then calculating the Bermuda Fund's pro rata share of that cash flow.

64. The statement is also misleading because, by omitting to describe the manner in which the interest rates were derived, it conveys the deceptive impression that the loans were similar to pure debt instruments. They were not. Instead, they provided equity-like returns that depended upon the performance of American Assurance's underlying assets.

65. The false and misleading statement was material because it mischaracterized the nature and risks of an investment in the Bermuda Fund, and because it concerned the interest rates, which were the Bermuda Fund's only return on its investment in American Assurance.

66. Defendants were responsible for determining the interest rates for the promissory notes. They knew, or were reckless or negligent in not knowing, that the statement was false and misleading.

## V. CORNERSTONE AND GEIGER, WITH NGO'S SUBSTANTIAL ASSISTANCE, MADE MATERIAL MISREPRESENTATIONS AND OMISSIONS ABOUT CORNERSTONE'S OWNERSHIP STRUCTURE

67. The Defendants made material misrepresentations and omissions concerning Cornerstone's ownership in Forms ADV that it filed with the Commission in 2018 and 2019 and in other communications to investors.

68. On or about March 29, 2017, Cornerstone's Prior Owner died.

69. In the succeeding months, Geiger and Ngo negotiated with his estate to acquire Cornerstone. On February 28, 2018, the parties executed a purchase and sale agreement pursuant to which Geiger and Ngo acquired Cornerstone for $525,000, and

each received a written assignment of a fifty percent ownership interest in the firm.

70.     The U.S. federal and California state tax returns for Cornerstone, Geiger, and Ngo for 2018 through 2020 stated that Geiger and Ngo each owned fifty percent of Cornerstone's capital.

**A.     Cornerstone and Geiger Misrepresent Geiger's Ownership on the Form ADV Filed with the Commission**

71.     Schedule A of Form ADV Part 1 instructs filers organized as limited liability companies to list "those members than have the right to receive upon dissolution, or have contributed, 5% or more of [the LLC's] capital."

72.     On March 9, 2018, Cornerstone filed its annual updating amendment to its Form ADV with the Commission.  It stated on Schedule A that Geiger owned 75% or more of Cornerstone's capital and that Ngo's ownership interest was "not applicable."  Since 2018, Cornerstone has provided the same ownership information on Schedule A of each of its annual updating amendments to its Forms ADV Part 1, which were filed on March 7, 2019, March 26, 2020, and March 29, 2021.

73.     The instructions for Form ADV Part 2A, known as the "firm brochure," require filers to identify their principal owners, including persons owning 25% or more of the firm.  Cornerstone's firm brochure, filed on March 8, 2018, stated that, "The material changes include a change of ownership from [the Prior Owner] (and his estate) to Derren L. Geiger."  Under the heading "Ownership," it stated that "Cornerstone is owned by Derren L. Geiger."

74.     The brochure omitted to make any mention of Ngo's ownership interest in Cornerstone.  Since 2018, the "Ownership" section of each of Cornerstone's firm brochures, which were filed on March 7, 2019, March 26, 2020, and March 29, 2021 has remained the same.

75.     On March 8, 2018, Cornerstone's outside compliance consultant (the "Consultant") sent drafts of Cornerstone's March 2018 Form ADV Part 1 and 2A to Geiger and Ngo for their review and approval before they were filed.  The Consultant

highlighted the new ownership information on Schedule A of Part 1 in yellow and directed Geiger's and Ngo's attention to page 4 of the firm brochure, which contained the ownership information.

76.     The signature page of each of the Forms ADV Part 1 required Cornerstone to certify, "under penalty of perjury under the laws of the United States of America," that the information contained in the form was true and correct.

77.     Cornerstone and Geiger knowingly, intentionally, and/or recklessly made the false statements in the Forms ADV.  Geiger reviewed the Forms ADV before they were filed and had final responsibility for the accuracy of their contents.

**B.     Ngo Substantially Assisted the Misrepresentation**

78.     Ngo provided substantial assistance to Cornerstone and Geiger by reviewing the Forms ADV for accuracy and providing Geiger with feedback.  In doing so, Ngo knew or recklessly disregarded the fact that Cornerstone was filing Forms ADV with the Commission that included false information about Cornerstone's ownership.

79.     Cornerstone's March 25, 2020, response to the SEC Deficiency Letter attached a "First Amendment" to Cornerstone's LLC Agreement that provided that Ngo had only a fifty percent profit-sharing interest in Cornerstone, with no obligation to make contributions and no right to receive distributions on any liquidation or dissolution of Cornerstone.

80.     The "First Amendment" stated that it was "made and entered into as of the 1st day of January 2019," and the response to the SEC Deficiency Letter claimed that it was "effective as of January 1, 2019."  In fact, Geiger and Ngo did not execute the "First Amendment" until December 2019 at the earliest, more than eight months after Cornerstone filed its 2019 Form ADV Part 1 and 2A with the Commission, and almost two years after its false 2018 update.

///
///

## C.   Defendants Fraudulently Misrepresented Cornerstone's Ownership Status to Current and Prospective Investors

81.   The Defendants also knowingly, recklessly, or negligently held Geiger out to prospective and existing investors as Cornerstone's sole owner.  Geiger personally told prospective and existing investors that he owned Cornerstone while omitting to make any mention of Ngo's ownership interest.  On April 24, 2018, Ngo instructed the administrator for the U.S. and Bermuda Funds to send Cornerstone's 2018 firm brochure containing the false ownership information to all current investors.

82.   The identity of Cornerstone's owners was material to investors.  After the Prior Owner's death, investors in the U.S. Fund and the Bermuda Fund asked questions and expressed concerns about Cornerstone's future ownership.  In a January 3, 2018, email to Ngo concerning the negotiations to acquire Cornerstone, Geiger wrote, "Lack of clarity has damaged business.  No subscriptions at this semi-annual period when Caritas [the U.S. Fund and the Bermuda Fund] outperformed nearly all other energy investments."

83.   Defendants misrepresented to investors that Geiger was Cornerstone's sole owner because Geiger was the Cornerstone executive who was best known to investors.  In emails after the Prior Owner's death, Geiger reassured certain investors that he was attempting to acquire Cornerstone, and made no mention of Ngo.

84.   In a November 4, 2019 written submission to Commission staff during the Examination, Geiger and Ngo stated that it was Geiger who had "long-term relationships" with the private funds' investor base and who had the "immense experience" and business contacts in the oil and gas sector.  In contrast to Geiger, Ngo had only very limited interactions with investors.

85.   Cornerstone obtained money as a result of the misrepresentations and omissions in the Forms ADV, prospectuses, due diligence questionnaires, audited financial statements, and other communications with prospective and existing

investors because it earned asset-based management fees from the U.S. and Bermuda Funds.  Since March 2018, Geiger and Ngo also obtained money as a result of the misrepresentations and omissions because Geiger has always had an ownership interest in Cornerstone, and Ngo has always had an ownership or a profit sharing interest in Cornerstone.

86.     According to records from the most recent administrator for the Bermuda and U.S. Funds, which cover the period of January 2014 through September 2021, there were 87 subscriptions to the Bermuda Fund, totaling more than $81 million, during that period.  From March 2018 through September 2021, there were at least 34 subscriptions to the Bermuda Fund, totaling more than $9 million, and 24 subscriptions to the U.S. Fund, totaling more than $6.6 million.

**D.     Cornerstone, through Ngo, Recorded Inaccurate Entries in its General Ledger**

87.     Ngo recorded inaccurate entries in Cornerstone's 2018 general ledger concerning her and Geiger's acquisition of Cornerstone.  The 2018 general ledger reflected that:

- On February 28, 2018, Cornerstone loaned each of Geiger and Ngo half of the $525,000 purchase price for Cornerstone;

- On March 8, 2018, Geiger and Ngo each made $90,000 in "loan repayments" to Cornerstone; and

- On June 18, 2018, Geiger and Ngo each made $200,000 in "loan repayments" and "additional paid-in capital" to Cornerstone.

88.     Each of these entries was inaccurate because none of the lending and repayment transactions that they reflected actually took place.

89.     Cornerstone subsequently produced the 2018 general ledger containing the inaccurate entries to Commission staff during the Examination.

///

///

///

## VI.   CORNERSTONE FAILED TO ADOPT AND IMPLEMENT WRITTEN COMPLIANCE POLICIES AND PROCEDURES REASONABLY DESIGNED TO PREVENT VIOLATIONS OF THE ADVISERS ACT

90.    Prior to its March 2020 response to the SEC Deficiency Letter, Cornerstone failed to make and implement written compliance policies and procedures reasonably designed to prevent violations of the Advisers Act in connection with (a) its provision of short-term loans to American Assurance; and (b) its methods and calculations for determining the interest rates and principal amounts for the promissory notes.

91.    Cornerstone's lack of written policies and procedures led to compliance risks for the firm and exposed the U.S. and Bermuda Funds, and their underlying investors, to risks.

92.    During the Relevant Period, Cornerstone made three short-term loans to American Assurance for the following amounts on the following dates:

- $1.29 million on July 26, 2018;
- $245,000 on August 27, 2018; and
- $1 million on December 31, 2019.

93.    Cornerstone failed to memorialize the terms of the July and August 2018 loans in a promissory note or any other written agreement and had no written policies or procedures for doing so.

94.    Cornerstone had a conflict of interest in making the short-term loans because it received interest payments on the loans from American Assurance. Nonetheless, Cornerstone failed to disclose the short-term loans and associated conflicts to investors in the U.S. and Bermuda Funds, and had no written policies or procedures for doing so, until after it received the SEC Deficiency Letter.

95.    Cornerstone also lacked any policies and procedures reflecting or demonstrating any methodology for determining the interest rates and principal amounts of the promissory notes issued by American Assurance to the Bermuda

Fund, including its reasons for certain positive and negative adjustments to the principal amounts.

96.    In addition, Cornerstone failed to document its actual calculations with respect to the promissory notes' interest rates and principal amounts.  As a result, Cornerstone was unable to substantiate its methods and calculations, or that its methods were consistently applied.

97.    As Cornerstone's COO, and then its CEO and co-owner, Geiger made the final decisions concerning the short-term loans and the promissory notes' interest rates and principal amounts.  As Cornerstone's CCO since 2015, Geiger was also responsible for Cornerstone's written compliance policies and procedures.  Geiger was contemporaneously aware of the interest payments that Cornerstone received on its short-term loans to American Assurance, the absence of written agreements for two of the loans, and the fact that Cornerstone was unable to substantiate its methods or calculations for the promissory notes' interest rates and principal amounts.

98.    Nonetheless, Geiger knowingly or recklessly failed to take any steps to have Cornerstone adopt and implement written compliance policies and procedures to address these risks.

## VII.   DEFENDANTS' ILL-GOTTEN GAINS

99.    During the Relevant Period, Cornerstone obtained more than $3.3 million in asset-based management fees from the Bermuda Fund during its fraudulent course of conduct.

100.   As for the U.S. Fund, since March 2018, when Defendants began misrepresenting that Geiger was Cornerstone's sole owner, Cornerstone obtained more than $950,000 in asset-based management fees from the U.S. Fund.

101.   Prior to March 2018, Geiger and Ngo participated in Cornerstone's ill-gotten gains through compensation that was derived from Cornerstone's revenues, including its receipt of management fees from the Bermuda and U.S. Fund. Thereafter, Geiger always had an ownership interest in Cornerstone, and Ngo always

had an ownership or a profit-sharing interest in Cornerstone.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act

### (Against All Defendants)

102.   The SEC realleges and incorporates by reference paragraphs 1 through 14, 16-77, 79-89, and 99-101 above.

103.   As a result of the conduct alleged herein, Defendants Cornerstone, Geiger, and Ngo each, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails:  (a) knowingly or recklessly employed devices, schemes, or artifices to defraud; (b) knowingly, recklessly, or negligently obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and (c) knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers, in violation of Sections 17(a)(1), (2), and (3) of the Securities Act [15 U.S. C. § 77q(a)(1), (2), and (3)].

104.   By engaging in the foregoing conduct, Cornerstone, Geiger, and Ngo violated, and unless restrained and enjoined, will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

### (Against All Defendants)

105.   The SEC realleges and incorporates by reference paragraphs 1 through 14, 16-77, 79-89, and 99-101 above.

106.   As a result of the conduct alleged herein, Defendants Cornerstone, Geiger, and Ngo each directly or indirectly, in connection with the purchase or sale of

securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or a facility of a national securities exchange, knowingly or recklessly, (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and subsections (a), (b), and (c) of Rule 10b-5 thereunder [17 C.F. R. § 240.10b-5(a), (b), and (c)].

107.   By engaging in the foregoing conduct, Cornerstone, Geiger, and Ngo violated, and unless restrained and enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

### THIRD CLAIM FOR RELIEF

### Violations of Section 204 of the Advisers Act and Rule 204-2 Thereunder
### (Against Cornerstone)

108.   The SEC realleges and incorporates by reference paragraphs 1 through 33, 67-77, 79-101 above.

109.   As a result of the conduct alleged herein, Defendant Cornerstone, while an investment adviser registered under Section 203 of the Advisers Act [15 U.S.C. § 80b-3], which made use of the mails or of the means or instrumentalities of interstate commerce in connection with its business as an investment adviser, failed to make and keep true, accurate, and current books and records relating to its investment advisory business, and made untrue and inaccurate books and records subject to examination by representatives of the Commission.

110.   By engaging in the foregoing conduct, Cornerstone violated, and unless restrained and enjoined, will continue to violate, Section 204 of the Advisers

Act [15 U.S.C. § 80b-4 and Rule 204-2 [17 C.F.R. § 275.204-2] thereunder.

## FOURTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 204 of the Advisers Act and Rule 204-2 Thereunder

### (Against Ngo)

111.   The SEC realleges and incorporates by reference paragraphs 1 through 101 above.

112.   As a result of the conduct alleged herein, Defendant Ngo aided and abetted Defendant Cornerstone's violations of Section 204 of the Advisers Act [15 U.S.C. § 80b-4] and Rule 204-2 thereunder [17 C.F.R. § 275.204-2] by knowingly or recklessly providing substantial assistance to Cornerstone which, while an investment adviser registered under Section 203 of the Advisers Act [15 U.S.C. § 80b-3], which made use of the mails or of the means or instrumentalities of interstate commerce in connection with its business as an investment adviser, failed to make and keep true, accurate, and current books and records relating to its investment advisory business, and made untrue and inaccurate books and records subject to examination by representatives of the Commission.

113.   By engaging in the foregoing conduct, Ngo directly or indirectly, aided and abetted, and unless restrained and enjoined, will again aid and abet, violations of Section 204 of the Advisers Act [15 U.S.C. § 80b-4] and Rule 204-2 [17 C.F.R. § 275.204-2] thereunder.

## FIFTH CLAIM FOR RELIEF

### Violations of Section 206(4) of the Advisers Act and Rule 206(4)-7 Thereunder

### (Against Cornerstone)

114.   The SEC realleges and incorporates by reference paragraphs 1 through 77, 79-89, and 99-101 above.

115.   As a result of the conduct alleged herein, Defendant Cornerstone, while registered as an investment adviser under Section 203 of the Advisers Act [15 U.S.C.

§ 80b-3], using the mails and the means and instrumentalities of interstate commerce, directly or indirectly, engaged in fraudulent, deceptive, or manipulative practices or courses of business, and failed to adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act and the rules thereunder by Cornerstone and its supervised persons, in violation of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 [17 C.F.R. § 206(4)-7] thereunder.

116.   By engaging in the foregoing conduct, Cornerstone violated and, unless restrained and enjoined, will continue to violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 [17 C.F.R. § 275.206(4)-7] thereunder.

## SIXTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 206(4) of the Advisers Act and Rule 206(4)-7 Thereunder

### (Against Geiger)

117.   The SEC realleges and incorporates by reference paragraphs 1 through 77, 79-89, and 99-101 above.

118.   As a result of the conduct alleged herein, Defendant Geiger aided and abetted Defendant Cornerstone's violations of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 [17 C.F.R. § 275.206(4)-7] thereunder by knowingly or recklessly providing substantial assistance to Cornerstone, which, while registered as an investment adviser under Section 203 of the Advisers Act [15 U.S.C. § 80b-3], using the mails and the means and instrumentalities of interstate commerce, directly or indirectly, engaged in fraudulent, deceptive, or manipulative practices or courses of business, and failed to adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act and the rules thereunder by Cornerstone and its supervised persons.

119.   By engaging in the foregoing conduct, Geiger directly or indirectly, aided and abetted, and unless restrained and enjoined, will again aid and abet,

violations of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 [17 C.F.R. § 275.206(4)-7] thereunder.

## SEVENTH CLAIM FOR RELIEF

### Violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder

### (Against Cornerstone and Geiger)

120.   The SEC realleges and incorporates by reference paragraphs 1 through 77, 79-89, and 99-101 above.

121.   At all times relevant to the Complaint, Defendants Cornerstone and Geiger acted as investment advisers to the U.S. Fund and the Bermuda Fund, which are pooled investment vehicles as defined in Rule 206(4)-8(b) [17 C.F.R. § 275.206(4)-8(b)] of the Advisers Act.  Defendants Cornerstone and Geiger, while acting as investment advisers to one or more pooled investment vehicles, by use of the mails or means or instrumentalities of interstate commerce, each directly or indirectly:  (a) made untrue statements of material fact and omitted to state material facts necessary to make statements made, in the light of the circumstances under which they were made, not misleading, to investors and prospective investors in a pooled investment vehicle; and (b) otherwise engaged in acts, practices, or courses of business that were fraudulent, deceptive, or manipulative with respect to investors or prospective investors in a pooled investment vehicle.

122.   By engaging in the foregoing conduct, Defendants Cornerstone and Geiger violated, and unless restrained and enjoined, will again violate, Section 206(4) of the Advisers Act [15 U.S.C. § 780b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

///

///

///

///

///

## EIGHTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 206(4) of the Advisers

### Act and Rule 206(4)-8 Thereunder

### (Against Ngo)

123.   The SEC realleges and incorporates by reference paragraphs 1 through 89, and 99-101 above.

124.   As a result of the conduct alleged herein, Defendant Ngo, directly or indirectly, aided and abetted Defendant Cornerstone's and Defendant Geiger's violations of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 [17 C.F.R. § 275.206(4)-8] thereunder by knowingly or recklessly providing substantial assistance to Cornerstone and Geiger who, while acting as investment advisers to one or more pooled investment vehicles, by use of the mails or means or instrumentalities of interstate commerce, each directly or indirectly: (a) made untrue statements of material fact and omitted to state material facts necessary to make statements made, in the light of the circumstances under which they were made, not misleading, to investors and prospective investors in a pooled investment vehicle; and (b) otherwise engaged in acts, practices, or courses of business that were fraudulent, deceptive, or manipulative with respect to investors and prospective investors in a pooled investment vehicle.

125.   By engaging in the foregoing conduct, Ngo aided and abetted and, unless restrained and enjoined, will again aid and abet violations of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8] thereunder.

## NINTH CLAIM FOR RELIEF

### Violations of Section 207 of the Advisers Act

### (Against Cornerstone and Geiger)

126.   The SEC realleges and incorporates by reference paragraphs 1 through 33, 67-77, and 79-101 above.

127.   As a result of the conduct alleged herein, Defendants Cornerstone and Geiger violated Section 207 of the Advisers Act [15 U.S.C. § 80b-7] by, directly or indirectly, through use of the mails, and the means and instrumentalities of interstate commerce, willfully making untrue statements of material fact in reports filed with the Commission under Section 203 of the Advisers Act [15 U.S.C. § 80b-3], or willfully omitting to state in such reports material facts which were required to be stated therein.

128.   Defendants Cornerstone and Geiger knowingly, intentionally, and/or recklessly made the aforementioned untrue statements or omitted the material facts required to be stated in such reports.

129.   By reason of the foregoing, Cornerstone and Geiger violated, and unless restrained and enjoined, will again violate, Section 207 of the Advisers Act [15 U.S.C. § 80b-7].

### TENTH CLAIM FOR RELIEF

**Aiding and Abetting Violations of Section 207 of the Advisers Act**

**(Against Ngo)**

130.   The SEC realleges and incorporates by reference paragraphs 1 through 33, 67-101 above

131.   As a result of the conduct alleged herein, Defendant Ngo aided and abetted Defendant Cornerstone's and Defendant Geiger's violations of Section 207 of the Advisers Act [15 U.S.C. § 80b-7] by, directly or indirectly, through use of the mails, and the means and instrumentalities of interstate commerce, willfully making untrue statements of material fact in reports filed with the Commission under Section 203 of the Advisers Act [15 U.S.C. § 80b-3], or willfully omitting to state in such reports material facts which were required to be stated therein.

132.   By reason of the foregoing, Defendant Ngo directly or indirectly, aided and abetted and, unless restrained and enjoined, will again aid and abet, violations of Section 207 of the Advisers Act [15 U.S.C. § 80b-7].

## PRAYER FOR RELIEF

**WHEREFORE**, the SEC respectfully requests that the Court enter a Final Judgment:

### I.

Finding that Defendants violated the federal securities laws as alleged herein;

### II.

Permanently restraining and enjoining Defendants, their agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing future violations of each of the securities laws and rules promulgated thereunder as alleged herein;

### III.

Ordering Defendants to disgorge all ill-gotten gains received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations;

### IV.

Ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)]; and

### V.

Granting such other and further relief as the Court may determine to be just, equitable, and necessary.

## JURY DEMAND

The SEC demands a trial by jury on all claims so triable.

Dated:  May 27, 2022

*/s/ James M. Carlson*
_____
James M. Carlson
Attorney for Plaintiff
Securities and Exchange Commission