UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                                    Plaintiff,<br><br>v.<br><br>CORNERSTONE ACQUISITION AND MANAGEMENT COMPANY LLC, DERREN L. GEIGER, and SHE HWEA NGO,<br><br>                                    Defendants. | Case No.:  22-CV-765 JLS (VET)<br><br>**ORDER ON MOTION FOR SUMMARY JUDGMENT AND *DAUBERT* MOTIONS**<br><br>(ECF Nos. 49, 50, 51, 52) |

Presently before the Court are Plaintiff Security and Exchange Commission's ("Plaintiff" or the "SEC") Motion for Summary Judgment ("MSJ," ECF No. 50), Defendants Cornerstone Acquisition Management Company LLC, Derren L. Geiger ("Mr. Geiger"), and She Hwea Ngo's ("Ms. Ngo") (collectively, "Defendants") Opposition thereto ("MSJ Opp'n," ECF No. 58), and Plaintiff's Reply in support thereof ("MSJ Reply," ECF No. 69).

Also before the Court are Defendants' Motion to Exclude Expert Testimony of Plaintiff's Expert Witness Gerald Fujimoto ("Mot. to Excl. Fujimoto," ECF No. 49), attached Memorandum of Points and Authorities ("Mot. to Excl. Fujimoto Mem.," ECF

No. 49-1), the SEC's Opposition ("Opp'n to Mot. to Excl. Fujimoto," ECF No. 55), and Defendants' Reply ("Reply to Mot. to Excl. Fujimoto," ECF No. 70). Additionally, the Court has received the SEC's Motion to Exclude Expert Testimony of Amy B. Hirsch ("Mot. to Excl. Hirsch," ECF No. 51), Defendants' Opposition ("Opp'n to Mot. to Excl. Hirsch," ECF No. 56) and the SEC's Reply ("Reply to Mot. to Excl. Hirsch," ECF No. 67). Lastly before the Court are the SEC's Motion to Exclude Purported Expert Testimony ("Mot. to Excl. Hybrid Experts," ECF No. 52), Defendants' Opposition ("Opp'n to Mot. to Excl. Hybrid Experts," ECF No. 57), and the SEC's Reply ("Reply to Mot. to Excl. Hybrid Experts," ECF No. 68).

The Court heard oral argument on December 17, 2024, and thereafter took the Motions under submission. Having considered the Parties' arguments, the law, and the evidence, the Court rules as follows.

## BACKGROUND

The SEC provides a statement of facts, which it contends are undisputed. MSJ at 2–10. Defendants, for their part, assert the SEC's statement of uncontested facts contains significant omissions, and lay out additional facts. MSJ Opp'n at 3–9. The facts that follow go undisputed in the Parties' moving papers.

### I.    Undisputed Facts

#### A.    *Cornerstone and its Operations*

Cornerstone was registered with the SEC as an investment adviser during April 2011 through November 2021 (the "Relevant Period"). Deposition of Derren Geiger ("Geiger Dep.") at 19:22–25, ECF No. 50-2; Deposition of She Hwea Ngo ("Ngo Dep.") at 23:2–16, ECF No. 50-3. Cornerstone provided "investment management services" to "U.S. and non-U.S. private investment funds," and it specialized in "U.S.-based oil and natural gas interests and similar securities." ECF No. 50-4 ("Form ADV, Mar. 8, 2018") at CS0000000199.

As a registered investment adviser, Cornerstone was required to file, and periodically update disclosure documents, known as "Forms ADV," with the SEC.

17 C.F.R. §§ 275.203-1, 275.204.1; Geiger Dep. at 19:22–20:5.  After a Form ADV is filed with the SEC, it becomes publicly available.  Ngo Dep. at 24:15–19.

In 2009, Mr. Geiger became Cornerstone's Chief Operating Officer ("COO"); in 2015, he became Cornerstone's Chief Compliance Officer ("CCO"); and in 2018, he also became Cornerstone's Chief Executive Officer ("CEO") in addition to its CCO. Investigative Testimony of Derren Geiger ("Geiger Inv.") at 13:22–14:2, 19:10–18, ECF No. 50-7.  Mr. Geiger was "responsible for the day-to-day management of Cornerstone[] and the [Bermuda] Fund."  Caritas Royalties Fund Due Diligence Questionnaire, 2018 ("DDQ") at CS0000001250, ECF No. 50-8.

At Cornerstone, Mr. Geiger "conducted investment adviser activities," ECF No. 11 ("Answer") ¶ 2, including serving as "the Chairman of the Investment Committee," analyzing potential investments, and providing investment advice for compensation, *see* DDQ at CS0000001250; *see also* Geiger Dep. at 165:4–166:2.  As CCO, Mr. Geiger was also responsible for Cornerstone's legal compliance functions, including its Forms ADV that were filed with the SEC and its compliance policies and procedures.  Geiger Inv. at 20:14–21:14; DDQ at CS0000001248.  Mr. Geiger testified it was "important" for the Forms ADV to be accurate.  Geiger Dep. at 159:20–160:3.

Ms. Ngo, a certified public accountant ("CPA"), joined Cornerstone in 2014, as its controller.  Ngo Dep. at 11:19–12:16.  In 2015, Ms. Ngo became the Chief Financial Officer ("CFO").  *Id.* at 13:21–14:7.  As CFO, Ms. Ngo was responsible for maintaining the books and records for Cornerstone and its funds.  *Id.* at 17:2–11.  Ms. Ngo also reviewed Cornerstone's Forms ADV before they were filed with the SEC.  *Id.* at 68:15–69:1.  Ms. Ngo agreed it was "important" for the Forms ADV to be accurate.  *Id.* at 68:23–69:1.

During the Relevant Period, Cornerstone advised or sub-advised three private funds: American Assurance 2000, LP ("American Assurance"); the Caritas Royalty Fund LLC (the "U.S. Fund"); and the Caritas Royalties Fund (Bermuda) Ltd. (the "Bermuda Fund"). *Id.* at 32:9–18; ECF No. 50-9 ("Form ADV, Mar. 9, 2018") at CS0000000158–59, 165, 172.  These private funds were "pooled investment vehicles" under the Advisers Act.  *See*

Form ADV, Mar. 8, 2018, at CS0000000201; *see also* 17 C.F.R. § 275.206(4)-8(b) (defining "pooled investment vehicle").

The structure of the funds Cornerstone advised was established based on advice from Cornerstone's external counsel.  Declaration of Derren Gieger ("Geiger Decl.") ¶ 5, ECF No. 59.  The U.S. Fund was open to U.S. investors and the Bermuda Fund was open to non-U.S. and U.S. tax exempt investors.  Geiger Decl. ¶ 5; Declaration of Jeffrey Rubinger ("Rubinger Decl.") ¶ 6, ECF No. 60.

The U.S. Fund and Bermuda Fund were the only two investors in American Assurance, which invested its capital in oil and gas royalty interests.  Gieger Decl. ¶¶ 5–7. For tax reasons, the U.S. Fund invested in the equity or shares of American Assurance, while the Bermuda Fund invested in American Assurance through a loan, memorialized through promissory notes issued by American Assurance to the Bermuda Fund that paid interest and were updated approximately twice a year.   Geiger Decl. ¶ 6; ECF No. 1 ("Compl.") ¶ 23; Answer ¶¶ 23, 30; ECF No. 50-11 ("Promissory Notes"); Ngo Dep. at 30:22–31:21, 47:2–4.  Interest paid on the promissory notes was the Bermuda Fund's only source of income and the only way investors in the Bermuda Fund made money on their investments.  Ngo Dep. at 31:1–13; Geiger Dep. at 60:12–20.  The interest rate was adjusted to ensure that interest paid under the promissory notes to Bermuda Fund investors generally responded to the returns of the U.S. Fund equity investors.  Geiger Decl. ¶¶ 6, 7.

### B. *Promissory Notes*

Mr. Geiger considered the promissory notes to be internal, administrative documents, and was not aware of any investor in the U.S. Fund or Bermuda Fund requesting to see a promissory note or seeing a promissory note.  Geiger Decl. ¶ 12. Beginning in April 2011, the promissory notes stated: "This Note is secured by that certain Assignment and Pledge of Ownership Interests of even date herewith by and among Cornerstone Acquisition Management Company, LLC, as the Pledgor and the Payee, as the Secured Party."  Promissory Notes at CS0000022522, 22524, 22526, 22528, 22532, 22540, 22542, 22544, 22546, 22550, 22548, 22552, 22560, 2384, 2380, 2382, 2376.  That

4

statement appeared in seventeen (17) of the promissory notes from April 1, 2011, through January 1, 2013.  *Id.*  Mr. Geiger signed all of the promissory notes.  *Id.*; Answer ¶ 52; Geiger Dep. at 89:10–107:12.

In March 2013, the sentence in the promissory notes referencing security for the notes was brought to Mr. Geiger's attention.  Geiger Decl. ¶¶ 13–14.  Mr. Geiger contacted Cornerstone's counsel to ask whether there was any requirement that the promissory note be secured, and counsel responded that they were not aware of any such requirement.  *Id.* ¶ 14; Rubinger Decl. ¶ 10.  Mr. Geiger then contacted Cornerstone's counsel to confirm whether the promissory note was in fact secured.  *Id*. ¶ 16; Rubinger Decl. ¶ 11.  Cornerstone's counsel confirmed the loan was not secured, and no Party to this suit contends otherwise.  *Id*. ¶ 17.  The following day, Cornerstone issued—at Mr. Geiger's direction—an amended promissory note, in which the reference to the Assignment and Pledge was removed.  *Id.*

When Ms. Ngo joined Cornerstone in 2014, she assumed responsibility for preparing the promissory notes, although Mr. Gieger continued to sign them.   Ngo Dep. at 46:14–47:12.  In late 2014, Ms. Ngo was advised by Cornerstone's outside accountant to make sure that the promissory note was consistent with an internal tax opinion that Cornerstone had obtained from counsel years before.  *Id.* ¶ 7; Declaration of Michael Hearne ("Hearne Decl.") ¶ 7, ECF No. 62.  That opinion included legal language referring to a secured interest.  *Id.* ¶ 8. To make the promissory note consistent with Cornerstone's counsel's tax opinion, Ms. Ngo re-inserted the sentence regarding the secured interest to the promissory note issued in November 2014 and subsequent versions of the note.  *Id.*

When preparing the promissory note in July 2018, Ms. Ngo brought the sentence referencing security by an Assignment and Pledge of Ownership Interest to Mr. Geiger's attention.  Ngo Decl. ¶ 10.  At Mr. Geiger's instruction, Ms. Ngo emailed Cornerstone's counsel to ask whether that sentence should be included in the note.  Geiger Decl. ¶ 21.  Counsel replied that the language was not necessary for tax reasons.  *Id.*; Ngo Decl. ¶ 11. At Mr. Geiger's direction, Ms. Ngo removed the sentence from the promissory note dated

June 1, 2018.  *Id.* ¶ 22; Ngo Decl. ¶ 11.

The promissory notes were available for inspection, upon request, by Cornerstone investors.  Geiger Inv. at 83:10–24.  Both Mr. Geiger and Ms. Ngo testified that it was "important" for the promissory notes to be accurate.  Geiger Dep. at 89:10–107:12; Ngo Dep. at 32:6–8, 48:19–21.

## C.    *Bermuda Fund Prospectus*

Cornerstone's outside counsel drafted the April 2011 Bermuda Fund Prospectus. Geiger Decl. ¶ 23.  The Prospectus contained a risk disclosure stating: "The loan of the Fund to the Owner [American Assurance] will be a general unsecured claim of the Owner . . . .  ECF No. 50-10 ("Prospectus, Apr. 1, 2011") at CAS0000024313.  The April 2011 Prospectus also included a statement that "there will be sufficient security" for the debt (i.e., the membership interests in the Owner [American Assurance] will be pledged as collateral for the [Bermuda] Fund Loans."  Prospectus, Apr. 1, 2011 at CS0000024281. Mr. Geiger participated in drafting the Prospectus, Geiger Dep. at 54:12–55:24, 59:2–6, but at this time Mr. Geiger was only Cornerstone's COO, not its CEO or owner, and Cornerstone's CFO, Brad Cox, was the primary contact with Cornerstone's counsel regarding the preparation of offering documents, Geiger Decl. ¶ 23.  Ms. Ngo did not work for Cornerstone at this time.  Ngo Decl. ¶ 2.

In January 2013, shortly after Brad Cox left Cornerstone, Mr. Geiger became the primary point of contact with Cornerstone's counsel.  Geiger Decl. ¶ 24.  At that time, Cornerstone's counsel was revising the April 2011 Bermuda Fund Prospectus.  *Id.*  As part of this review, counsel brought the language regarding "sufficient security" to Mr. Geiger's attention.  *Id.* ¶ 25.  Mr. Geiger responded to counsel that he was not aware of the loan being secured.  *Id.* ¶ 26.  In September 2013, a revised version of the Bermuda Fund Prospectus was issued, which removed the "sufficient security language."  *Id.* ¶ 28.

In July 2014, the Bermuda Fund Prospectus was further revised.  *Id.* ¶ 29.  This version (and every subsequent version) of the Prospectus defines the term "Fund Loans" to mean "unsecured inter-company loans" and the Prospectus states in three places that the

loans between the Bermuda Fund and American Assurance are "unsecured inter-company loans." *Id.* ¶ 29; Geiger Decl. Exhibit ("Ex.") I at 103, 124, 188, ECF No. 59-10.

Upon issuance, the July 2014 Prospectus was sent to all existing Bermuda Fund investors. *Id.* ¶ 29. All existing investors were required to execute new subscription documents, certifying that they had reviewed and understood the updated Prospectus. *Id.*; Geiger Decl. Ex. I at 85–86.

### D. Financial Statements

In April 2016, Cornerstone added a sentence stating "the fair value of the [promissory] note receivable is influenced by the current market conditions surrounding the value of the underlying collateral" to a footnote in its annual financial statements. Bermuda Fund Dec. 13, 2015 Financial Statements and Auditor's Report ("Fin. Stmts. and Auditor's Rep.") at SEC-CAMC-E-0002875, ECF No. 50-13. Ms. Ngo prepared these financial statements, Mr. Geiger reviewed them, and they were sent to investors. Ngo Dep. at 38:11–40:12, 42:4–44:20; Geiger Inv. at 90:13-19. This addition was made directly in response to a request from Cornerstone's auditors, who reviewed and approved the sentence. Ngo Decl. ¶¶ 13–22. Mr. Geiger and Ms. Ngo testified that it was "important" for the audited financial statements to be accurate. Geiger Dep. at 121:12–15; Ngo Dep. at 27:7–17.

### E. Communications with Investors

On June 9, 2016, in response to a potential investor's questions over email, Mr. Geiger wrote that the promissory notes were "secured debt." Email from Geiger to Stephan Gerwert, et al., June 9, 2016, at SEC-BMA-E-0002813, ECF No. 50-17; Geiger Dep. at 134:3–12. That investor was provided with other information and disclosures and did not consider the debt to be secured. Geiger Decl. ¶ 38; Excerpt of Stephan Gerwert's Deposition ("Gerwert Dep.") at 11:18–21, ECF No. 63-2. On June 6, 2018, in response to an investor's questions, Mr. Geiger was copied on an email from Henry Cox ("Mr. Cox") to the investor, stating that the promissory notes were "collateralized by the underlying oil and gas assets." Email from Cox to Dudekin, et al., June 6, 2018, at CS0000015117, ECF

No. 50-18; Geiger Dep. at 131:21–132:11.  Mr. Cox was the Managing Director and CCO of an entity called Cornerstone Management (Bermuda) Ltd., which advised the Bermuda Fund, along with Cornerstone.  DDQ at CS0000001246–1247; Deposition of Henry Cox ("Cox Dep.") at 23:20–24:15, ECF No. 50-19; Ngo Dep. at 96:17–24.

### F.    Communications with SEC

In October 2019, in connection with an SEC examination of Cornerstone, the SEC staff requested a "[w]ritten description of the collateral" for the promissory note from American Assurance to the Bermuda Fund.  Email from Vyas to Geiger, et al., Oct. 25, 2019, at SR-17(f), ECF No. 50-20; Ngo Dep. at 79:5–25.  In response, on November 4, 2019, Mr. Geiger wrote that the "underlying oil and gas assets held by [American Assurance] that are attributable to [the Bermuda Fund]'s share of total capital in the investment strategy is considered to be the collateral of the Note."  Geiger Decl. ¶ 54; Email from Geiger to Pelkie, et al., Nov. 4, 2019, at SEC-CAMC-E-0004711, ECF No. 50-21. Before Cornerstone sent this response to the SEC, Ms. Ngo shared a draft of the response with one of Cornerstone's auditors.  Geiger Decl. ¶ 57.  Also on November 4, 2019, Ms. Ngo sent an email to one of Cornerstone's auditors, forwarding the information provided to the SEC, including the statement that oil and gas assets were "collateral" for the promissory notes.   Email from Ngo to Rajesh, Nov. 4, 2019, at Weaver 0127492, ECF No. 50-22; Ngo Dep. at 81:12-82:15.

In September 2021, Mr. Geiger and Ms. Ngo testified that the promissory notes were not secured by any collateral.  Investigation Testimony of She Hwea Ngo ("Ngo Inv.") at 74:7–19, ECF No. 50-23; Geiger Inv. at 50:2–23, 85:19–21.  Mr. Cox testified to the same on April 26, 2024.  Cox Dep. at 108:22–109:12, 113:16–21.  Additionally, in May 2024, Ms. Ngo and Mr. Geiger testified they never saw an executed version of the "Assignment and Pledge of Ownership Interests" referenced in the promissory notes.  Ngo Dep. at 47:17–48:5; Geiger Dep. at 116:22–117:3.

/ / /

/ / /

### G.     Ownership of Cornerstone

In March 2017, the then-owner of Cornerstone passed away, and on February 28, 2018, Mr. Geiger and Ms. Ngo executed a Limited Liability Company Interest Purchase Agreement (the "Purchase Agreement") to purchase Cornerstone from the estate of its prior owner for $525,000.   Purchase Agreement, Feb. 28, 2018 ("Purchase Agreement") at CS0000007333, ECF No. 50-24; Geiger Dep. at 154:5–156:2; Ngo Dep. at 65:20–67:9. Under the Purchase Agreement, Mr. Geiger and Ms. Ngo each became "50%" owners of Cornerstone.   Purchase Agreement at CS0000007370.   On March 8, 2018, Cornerstone filed a Form ADV Part 2A with the SEC, stating that the company's recent "material changes" included a "change in ownership from D. Bruce McMahan (and his estate) to Derren L. Geiger."   Form ADV, Mar. 8, 2018, at CS0000000197.   The next day, on March 9, 2018, Cornerstone filed a Form ADV Part 1 with the SEC, stating that Mr. Geiger owned "75% or more" of Cornerstone and that Ms. Ngo owned "less than 5%."   Form ADV, Mar. 9, 2018, at 0000000188; Geiger Dep. at 158:14–162:6.

On April 24, 2018, Ms. Ngo sent an email to Cornerstone's fund administrator, copying Mr. Geiger, and directing that Cornerstone's Form ADV – Part 2A be distributed to "all current investors."   Email Ngo to Rice, et al., Apr. 24, 2018, at CS0000007517, ECF No. 50-25; Ngo Dep. at 72:12–73:22.   Mr. Geiger later testified that Cornerstone's ownership "would be certainly material to somebody's investment choice."   Geiger Inv. at 169:21–170:11.

### H.     Cornerstone's Books and Records

As Cornerstone's CFO, Ms. Ngo was primarily responsible for maintaining accurate books and records, including Cornerstone's general ledger.   Ngo Dep. at 23:17–25, 74:6–75:16.   The general ledger maintained by Ms. Ngo was a purely internal, bookkeeping document.   Ngo Decl. ¶ 27.   The only instance Ms. Ngo is aware of with respect to a third party reviewing the general ledger was as part of the SEC's investigation.   *Id.* ¶ 27.

The general ledger reflected that (1) on February 28, 2018, Cornerstone loaned each of Mr. Geiger and Ms. Ngo $262,500 (adding up to the $525,000 purchase price of

Cornerstone); (2) on March 8, 2018, Mr. Geiger and Ms. Ngo each made $90,000 in "Loan Repayment[s]" to Cornerstone; and (3) on June 18, 2018, Mr. Geiger and Ms. Ngo each made $200,000 in "Loan Repayment[s] and Additional Paid-In Capital." Cornerstone General Ledger, Jan.-Dec. 2018, at SEC-CAMC-E-0003709–710, ECF No. 50-26; Ngo Dep. at 74:6–75:16.

Ms. Ngo later admitted that the general ledger entries above were incorrect and not accurate. Ngo Inv. at 185:3–188:13 (purported $262,500 loans were "incorrect" and "just not the correct booking"); 195:14–196:4 ($90,000 entries were "wrong, too . . . it's a series of incorrect mis [sic] entries"); 196:5–24 ($200,000 entries were also "incorrect entries").

Additionally, the promissory notes from American Assurance to the Bermuda Fund (described above) were maintained as part of Cornerstone's books and records. Ngo Dep. at 46:1–13.

### I.    Cornerstone's Policies and Procedures

In July 2019, the SEC staff began an examination of Cornerstone. Answer ¶ 33. On February 18, 2020, the SEC staff shared the findings of its examination with Mr. Geiger. Letter from Jung to Geiger, Feb. 18, 2020, at CS0000019326, ECF No. 50-27; Ngo Dep. at 96:4–24. The staff's findings noted, among other things, that Cornerstone did not have written policies and procedures to address compliance risks related to (i) short-term loans that Cornerstone made to American Assurance; (ii) the determination of interest rates for the promissory notes issued by American Assurance to the Bermuda Fund; and (iii) the determination of principal adjustments for the promissory notes issued by American Assurance to the Bermuda Fund. Letter from Jung to Geiger, Feb. 18, 2020, at CS0000019332, ECF No. 50-27. That same day, Mr. Geiger sent the SEC's findings to Mr. Cox and Ms. Ngo. Email from Geiger to Cox, et al., Feb. 18, 2020, at CS0000019324, ECF No. 50-27.

The next day, February 19, 2020, Mr. Cox told Mr. Geiger and Ms. Ngo that "the current Note structure needs to be properly disclosed and procedures set in place that explain how the Notes are determined / negotiated." Email from Cox to Geiger, et al.,

Feb. 19, 2020, at CS0000019324 ECF No. 50-27; Ngo Dep. at 97:17–98:3.  About one month later, on March 25, 2020, Mr. Geiger informed the SEC that Cornerstone had "adopted and implemented" written policies and procedures for (i) short-term, related-party loans, such as the loans Cornerstone made to American Assurance; (ii) the determination of interest rates for the promissory notes issued by American Assurance to the Bermuda Fund; and (iii) the determination of principal adjustments for the promissory notes issued by American Assurance to the Bermuda Fund.  ECF No. 50-28 at SEC-SECEXAMS-E-0009635 (Letter from Geiger to Jung, Mar. 25, 2020), -0009638 (Note Interest Rate Determination Policy), -0009644 (Note Principal Determination Policy), -0009645 (Related Party Promissory Note Policy); Ngo Dep. at 109:8–111:17.

The Related Party Promissory Note Policy implemented procedures to ensure that information about such loans would "be disclosed to investors through a timely written notification."  Related Party Promissory Note Policy at SECSECEXAMS-E-0009645, ECF No. 50-28.  The Note Interest Rate Determination Policy and Note Principal Determination Policy implemented procedures to ensure that the interest rates and principal adjustments for the promissory notes from American Assurance to the Bermuda Fund would be set according to specific, written guidelines.  Note Interest Rate Determination Policy at SEC-SECEXAMS-E-00096, ECF No. 50-28; Note Principal Determination Policy at SEC-SECEXAMS-E-0009644, ECF No. 50-28.

## II.    Procedural Background

The SEC filed this action in this Court on May 27, 2022, alleging all Defendants violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 (Claims 1 and 2); Cornerstone violated Section 204 of the Advisers Act and Rule 204-2 (Claim 3); Ms. Ngo aided and abetted Cornerstone's violation of Section 204 of the Advisers Act and Rule 204-2 (Claim 4); Cornerstone violated Section 206(4) of the Advisers Act and Rule 206(4)-7 (Claim 5); Mr. Geiger aided and abetted Cornerstone's violation of Section 206(4) of the Advisers Act and Rule 206(4)-7 (Claim 6); Cornerstone and Mr. Geiger violated Section 206(4) of the Advisers Act and Rule 206(4)-8 (Claim 7);

Ms. Ngo aided and abetted Cornerstone and Mr. Geiger's violation of Section 206(4) and Rule 206(4)-8 (Claim 8); Cornerstone and Mr. Geiger violated Section 207 of the Advisers Act (Claim 9); and Ms. Ngo aided and abetted Cornerstone and Mr. Geiger's violation of Section 207 (Claim 10). *See* Compl.

On August 6, 2024, the SEC filed the instant Motion for Summary Judgment, Motion to Exclude Expert Testimony of Ms. Hirsch, and Motion to Exclude Purported Expert Testimony. *See* MSJ; Mot. to Excl. Hirsch; Mot. to Excl. Hybrid Experts. On the same day, Defendants filed a Motion to Exclude Expert Testimony of Mr. Fujimoto. *See* Mot. to Excl. Fujimoto. On August 23, 2024, Defendants filed Oppositions to each of the SEC's Motions. *See* MSJ Opp'n; Opp'n to Mot. to Excl. Hirsch; Opp'n Mot. to Excl. Hybrid Experts. The SEC also filed its Opposition to Defendants' Motion. *See* Opp'n to Mot. to Excl. Fujimoto. On August 30, 2024, the SEC filed responses in Reply to its Motions. *See* MSJ Reply; Reply to Mot. to Excl. Hirsch; Reply to Mot. to Excl. Hybrid Experts. The same day, Defendants also filed a Reply to their Motion. *See* Reply to Mot. to Excl. Fujimoto.

## DAUBERT MOTIONS

### I.    Legal Standard

The standard for expert testimony relevant here is set forth in Federal Rule of Evidence ("Rule") 702, as interpreted by *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and its progeny. Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

*Daubert* and subsequent cases have interpreted Rule 702 as requiring that evidence be both relevant and reliable. 509 U.S. at 589–95. As the Ninth Circuit explained:

> Under *Daubert* and its progeny, including *Daubert II* [*Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311 (9th Cir.1995)], a district court's inquiry into admissibility is a flexible one. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). In evaluating proffered expert testimony, the trial court is "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation and quotation marks omitted). "[T]he trial court must assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Id.* at 564 (quoting *Daubert*, 509 U.S. at 597[]). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id.* at 565 (citation and internal quotation marks omitted). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* at 564 (citation omitted). The judge is "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska*

13

*Rent-A-Car*, 738 F.3d at 969. Simply put, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id.* at 969–70.

*City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043–44 (9th Cir. 2014). "Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury." *Id.* at 1044.

### A. Motion to Exclude Testimony of Gerald Fujimoto

Defendants seek to exclude the testimony of Gerald Fujimoto ("Mr. Fujimoto"), an expert witness for the SEC. Mot. to Excl. Fujimoto Mem. at 1. Mr. Fujimoto is a forensic accountant, currently holding an active CPA license and working as a sole practitioner, with over 39 years of experience in conducting audits, forensic accounting investigations, and litigation consulting. Mr. Fujimoto's Expert Report ("Fujimoto Rep.") ¶¶ 2, 5, ECF No. 49-4. He provided services to clients through Deloitte from 1984 to 2020, first in the audit practice, including seven years as an audit partner, where he was involved in numerous high risk transactions and oversaw audits for both public and private companies, and then as a forensic accounting partner, where he conducted accounting investigations, assisting audit teams in potential fraud situations, and assisting counsel with litigation matters, including as an expert witness. *Id.* ¶ 4.

Defendants argue Mr. Fujimoto (1) is not qualified; (2) his opinions are improper narrative and unreliable; and (3) his opinions usurp the roles of the Court and the jury. *See generally* Mot. to Excl. Fujimoto Mem. Defendants also specify why each of the 14 opinions offered by Mr. Fujimoto should be excluded. *Id.* at 15–23. The SEC, in its Opposition, withdrew Opinion Nos. 3 and 5 through 14, leaving only Mr. Fujimoto's Opinion Nos. 1, 2, and 4 at issue. Opp'n to Mot. to Excl. Fujimoto at 1.

/ / /

/ / /

1              *1.      Qualifications*

2        Federal Rule of Evidence 702 "contemplates a broad conception of expert

3   qualifications." *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994).  An

4   expert may be qualified by either "knowledge, skill, experience, training, or education."

5   Fed. R. Evid. 702.  "A witness's knowledge of a general professional field may qualify

6   him or her to testify about a specific practice within that field."  *11333 Inc. v. Certain*

7   *Underwriters at Lloyd's, London*, 261 F. Supp. 3d 1003, 1015 (D. Ariz. 2017).

8        Defendants argue Mr. Fujimoto is not qualified to testify here despite his "wealth of

9   experience auditing companies," Mot. to Excl. Fujimoto Mem. at 23, because he lacks

10  experience working with investors in private funds, and his expert work and litigation

11  consulting cannot qualify him as an expert under Rule 702, *id.* at 23–24.  Defendants argue

12  Mr. Fujimoto's expertise in auditing is too general a category that it becomes "meaningless

13  when particularized" to the very specific type of security at issue here.  *Id.* at 24 (quoting

14  *SEC v. Tourre*, 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013)).  Defendants contend Mr.

15  Fujimoto's lack of recent experience in the oil and gas industry, other than as a junior

16  accountant on an audit nearly forty years ago; lack of experience working for hedge funds,

17  master funds, or any feeder fund; and the fact he has never invested in anything that he

18  would consider similar to the private fund investment at issue here, make him unqualified.

19  *Id.* at 24–25.

20       The SEC responds that Mr. Fujimoto has nearly forty years of experience as an

21  auditor, analyzing complex financial transactions and assessing materiality, and

22  accordingly he is qualified based on his experience with the subject matter at issue.  Opp'n

23  to Mot. to Excl. Fujimoto at 15.  The SEC contends Mr. Fujimoto does not claim to be an

24  expert solely based on his "prior expert work," *id.* at 16, and moreover, Mr. Fujimoto does

25  have experience working with private funds such as venture capital firms in connection

26  with their corporate investments, *id.* at 15.

27       The Court finds Mr. Fujimoto has sufficient experience with materiality from his

28  extensive accounting experience, and any "lack of particularized expertise" with the

specific transactions at issue, "goes to the weight accorded [the expert's] testimony, not to the admissibility of [his] opinion as an expert." *United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993). Thus, the Court **DENIES** Defendants' Motion on this ground.

### 2.    *Narrative Testimony*

Defendants also seek to exclude Mr. Fujimoto's opinions as they "consist almost exclusively of narrative testimony designed to present the SEC's case, whereby Mr. Fujimoto will quote from and summarize selected documents and witness testimony." Mot. to Excl. Fujimoto Mem. at 7.

Defendants' argument is at best premature. "[E]xpert testimony cannot be presented to the jury *solely* for the purpose of constructing a factual narrative based upon record evidence." *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1322 (S.D. Cal. 2020) (emphasis added), *aff'd*, 9 F.4th 1102 (9th Cir. 2021). But the Court cannot distinguish between constructing a factual narrative and "using relevant facts as context for [one's] expert opinions" in a pre-trial vacuum. *See Wells v. Allergan, Inc.*, No. CIV-12-973-C, 2013 WL 7208221, at *2 (W.D. Okla. Feb. 4, 2013); *see also In re Actos (Pioglitazone) Prods. Liab. Litig.*, No. 12-cv-00064, 2014 WL 120973, at *14 (W.D. La. Jan. 10, 2014) (An objection to the narrative nature of testimony, "is properly asserted at trial . . . . [I]t is not a proper objection to an *expert report*, that, itself, will not be placed into evidence, nor to a *Daubert* challenge." (emphasis in original)); *see also Holley v. Gilead Scis., Inc.*, No. 18-cv-06972-JST, 2023 WL 2469632, at *6 (N.D. Cal. Feb. 27, 2023) (holding on a motion to exclude expert testimony that "whether narrative or summary testimony will be admitted at trial is 'context specific' and will be decided at a later date").

Further, the Court does not find that Mr. Fujimoto's opinion is "merely facts," without any offered opinions, and thus should not be excluded on this basis. *See Est. of Cruz-Sanchez by & through Rivera v. United States*, No. 17-CV-569-AJB-NLS, 2019 WL 4450686, at *2 (S.D. Cal. Sept. 17, 2019) (holding an expert's opinion was not improper factual narrative because the expert report was not "merely facts" but "offer[ed]

opinions as well as facts").

In short, Mr. Fujimoto may testify regarding the facts he relied upon in forming his opinions if such facts are relevant, are not cumulative, and do not constitute a mere rehashing of otherwise admissible evidence, and any specific objections to narrative testimony must wait for trial. Presently, the Court **DENIES** Defendants' Motion as to this testimony.

### 3.    Reliability

Expert testimony "is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc.*, 738 F.3d at 969 (internal quotation marks omitted) (quoting *Primiano*, 598 F.3d at 565). "An expert's specialized knowledge and experience can serve as the requisite 'facts or data' on which they render an opinion." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022); *see also Hangarter v. Provident Life and Acc. Ins. Co.,* 373 F.3d 998, 1018 (9th Cir. 2004) (holding district court did not abuse its discretion in finding expert's testimony reliable based on his knowledge and experience where testimony was not contingent on a particular methodology or technical framework).

Defendants contend Mr. Fujimoto's opinions regarding materiality are unreliable because he does not apply the "total mix of information available" standard correctly and his opinions "depend on the unsupported and wrong assumption that Bermuda Fund investors were aware of the contents of the Promissory Notes that they never saw." Mot. to Excl. Fujimoto Mem. at 9–12. Defendants argue the promissory notes can only be in the "total mix" of information if they are "readily" or "reasonably" available to investors, and contends that, here, because the notes were only available for inspection at Cornerstone's office and were not actually viewed by any investor, they were not "readily" or "reasonably" available to investors. *Id.* at 10–11 (citing *Koppel v. 4987 Corp.*, 167 F.3d 125, 132 (2d Cir. 1999)). Defendants also argue Mr. Fujimoto's opinion is unreliable because he did not specifically discuss the Bermuda Fund prospectuses in his analysis. *Id.* at 12. Defendants contend their "disclosure of the truth" in such documents

"must have affected the 'total mix' of information available" to investors.  *Id.*

The SEC responds that a misstatement does not have to be literally viewed by investors to be material, but rather, the law only requires that the misrepresented fact "would have assumed actual significance in the deliberations" of a reasonable investor. Opp'n to Mot. to Excl. Fujimoto at 8 (quoting *SEC v. Murphy*, 50 F.4th 832, 847 (9th Cir. 2022)).  Further, the SEC contends the promissory notes were "reasonably" and "readily" available for inspection by investors, even though they were only available for viewing at Cornerstone's office, because they were not ancillary documents, as in *Koppel*, 167 F.3d 125, but the only way investors made money.  *Id.* at 9 n.6.  Moreover, the SEC argues Cornerstone also affirmatively told investors in prospectuses, financial statements, and emails that the promissory notes were secured, when they were not, making the notes a critical part of the total mix of information.  *Id.*

The Court finds Mr. Fujimoto's knowledge and experience is sufficient to provide an adequate basis for his opinions on materiality.  Mr. Fujimoto indicates he performed forensic accounting procedures in order to formulate his opinions and based his opinions on his review of materials obtained by the SEC in its investigation and litigation of this matter, his experience as a certified public accountant, and as a forensic accountant. Fujimoto Rep. ¶¶ 10–11.  Defendants can challenge Mr. Fujimoto's approach at trial, but "his choice of assumptions does not render his testimony inadmissible—only more or less persuasive when evaluated as a whole."  *Am. Nw. Distribs. Inc. v. Four Roses Distillery LLC*, No. 2:22-cv-01265-TMC, 2024 WL 3925038, at *14 (W.D. Wash. Aug. 20, 2024); *see also SEC v. Conaway*, No. 2:05-CV-40263, 2009 WL 1583546, at *3 (E.D. Mich. June 5, 2009) ("If defense counsel feels [plaintiff's expert] does not understand the standard of materiality . . . or is applying an incorrect standard of materiality, that proposition can be tested [o]n cross examination."); *Primiano*, 598 F.3d at 564 ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.'").  Accordingly, Mr. Fujimoto's testimony is not subject to exclusion on this basis, and the Court **DENIES** Defendants' Motion on this ground.

1   The Court now addresses Defendants' Motion as to each specific opinion at issue

2   below.

3                    *4.      Opinion-Specific Objections*

4                    a.      Opinion 1

5          Defendants contend Mr. Fujimoto's Opinion No. 1 should be excluded as it instructs

6   the jury on the definition of materiality, a question of law, including quoting the U.S.

7   Supreme Court.  Mot. to Excl. Fujimoto Mem. at 15.  The SEC responds that Mr. Fujimoto

8   is not going to instruct the jury on any question of law; rather, he references the accounting

9   document, SEC Staff Accounting Bulletin No. 99 ("SAB 99"), which explains that the

10  "formulation [of materiality] in the accounting literature is in substance identical to the

11  formulation used by the courts in interpreting the federal securities laws."  Opp'n to Mot.

12  to Excl. Fujimoto (quoting SEC Staff Accounting Bulletin: No. 99–Materiality (Aug. 12,

13  1999)).  In Reply, Defendants assert Mr. Fujimoto cannot reference SAB 99, which pertains

14  to preparing financial statements and performing audits of those financial statements,

15  because he is not offering an opinion on preparing or auditing financial statements.  Reply

16  at Mot. to Excl. Fujimoto at 1.

17         Instructing the jury as to the applicable law "is the distinct and exclusive province"

18  of the Court.  *Hangarter*, 373 F.3d at 1016 (quoting *United States v. Weitzenhoff*, 35 F.3d

19  1275, 1287 (9th Cir. 1993)).  The Court will not permit experts to instruct the jury as to the

20  applicable law.  However, Mr. Fujimoto may refer to the SAB 99 accounting document in

21  expressing an opinion, as he is an accountant opining on materiality, and may reference a

22  document that accountants use for that assessment, although such document references the

23  law.  *See id.* at 1017 (holding an expert "may refer to the law in expressing an opinion

24  without that reference rendering the testimony inadmissible" (quoting *Specht v. Jensen,*

25  853 F.2d 805, 809 (10th Cir.1988))).

26         The Court recognizes that depending on how the actual questions and answers are

27  framed, the testimony may or may not be objectionable.  However, the Court cannot predict

28  this circumstance in a vacuum and must await the legal context of actual questions and

answers. *See In re Actos (Pioglitazone) Prods. Liab. Litig.,* 2014 WL 120973, at \*12. Accordingly, as the Court is assured Mr. Fujimoto's testimony rests on a reliable foundation and is relevant to the task at hand, Defendants' Motion as to this Opinion is **DENIED** without prejudice to Defendants' right to raise objections, if appropriate, at trial.

b.    Opinion 2

In Opinion No. 2, Mr. Fujimoto opines that the promissory notes were extremely important to any potential investor or investor in the Bermuda Fund.  Fujimoto Rep. ¶ 34. Defendants argue Opinion No. 2 should be excluded because it (1) would mislead the jury; (2) goes to an ultimate issue in the case; and (3) is unreliable.  Mot. to Excl. Fujimoto Mem. at 15–16.  As to reliability, for the reasons discussed above, the Court finds Mr. Fujimoto's opinion reliable and will not exclude it on such basis.

Defendants argue Mr. Fujimoto concludes only that the value of the promissory notes is important, not that any investor considered any statement in any note important, and "[c]onflating these different concepts serves no purpose other than to mislead the jury and prejudice Defendants."  Mot. to Excl. Fujimoto Mem. at 15.  The SEC argues an explanation of why the promissory notes are important, based on Mr. Fujimoto's financial analysis, will be helpful to the jury in determining the materiality of statements made about the security of these notes.  Opp'n to Mot. to Excl. Fujimoto at 12.

The Court finds expert testimony about the importance of the promissory notes—the subject of the alleged misleading statements at issue in this case—is relevant to the pertinent inquiry, and as such, would "help the trier of fact."  Fed. R. Evid. 702.  The Court accordingly will not exclude the testimony on this basis.

Next, Defendants assert Mr. Fujimoto's statement that "any misstatement or omission related to any aspect of the Promissory Notes," particularly related to investment safety, expected return, or tax treatment, "would likely be material to a potential investor or investor in the Bermuda Fund," goes to the ultimate issue in the case.  Mot. to Excl. Fujimoto Mem. at 15–16 (quoting Fujimoto Rep. ¶ 43).  The SEC responds that Mr. Fujimoto is not going to testify what any specific investor did or thought, but is going to

explain, based on his financial analysis, why the promissory notes would be important to a reasonable investor, which will help the jury understand the case.  Opp'n to Mot. to Excl. Fujimoto at 12.

An expert witness cannot offer an opinion on an ultimate issue of law.  *Hangarter*, 373 F.3d at 1016.  The Ninth Circuit, however, distinguishes situations where challenged expert testimony addresses an ultimate issue of law in the case (inadmissible), from situations where the challenged expert refers to "his understanding" of a statutory provision that is not "directly at issue in the case" while opining as to an issue of *fact* (admissible). *See id.* at 1016–17.  In *Hangarter*, though the expert could not opine that the defendants "acted in bad faith"—the ultimate issue of law in the case—the expert could reference his understanding of state law to support his conclusion that the defendants "departed from insurance industry norms"—an issue of fact.  *Id.*

It is unclear here exactly what testimony would be elicited at trial, and as such, the Court cannot determine that Mr. Fujimoto's Opinion No. 2, at this juncture, is an inadmissible opinion on an ultimate issue of law.  While Mr. Fujimoto may not "undertake[] to tell the jury what result to reach," *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017), an opinion is not objectionable "just because it embraces an ultimate issue," Fed. R. Evid. 704(a).  Accordingly, counsel are cautioned that although Mr. Fujimoto will be permitted to present his opinions at trial if the questions are framed prudently, he may not invade the province of the jury to simply offer his opinion in place of theirs.

As the Court is otherwise assured Mr. Fujimoto's testimony rests on a reliable foundation and is relevant to the task at hand, the Court **DENIES** Defendants' Motion, without prejudice to their right to raise objections, if appropriate, at trial.

c.    Opinion 4

With respect to Opinion No. 4, Defendants argue this Opinion (1) goes to the ultimate issue; (2) is unreliable; (3) contains narrative testimony; and (4) testifies about Defendants Mr. Geiger and Ms. Ngo's state of mind.  Mot. to Excl. Fujimoto Mem.

at 17–18.

As discussed above, the Court finds Mr. Fujimoto's testimony regarding materiality sufficiently reliable for the purposes of the Court's "gatekeeping" function. Further, as described above, the Court will not exclude Mr. Fujimoto's opinions as narrative testimony without the context of what specific testimony is elicited at trial.

Defendants argue Mr. Fujimoto testifies as to Ms. Ngo and Mr. Geiger's states of mind when he characterizes the reinsertion of the language regarding the security of the loan as a "decision" by Ms. Ngo and Mr. Geiger. *Id.* at 18. The SEC responds that Mr. Fujimoto will not testify about the states of mind of Mr. Geiger or Ms. Ngo. Opp'n to Mot. to Excl Fujimoto at 14. The SEC also contends Mr. Fujimoto "used relevant facts as context" for his opinion. *Id.*

The Court agrees with Defendants that Mr. Fujimoto may not opine as to Mr. Geiger and Ms. Ngo's states of mind. However, the SEC contends it will not elicit such testimony. Further, while "an expert cannot speculate about what someone else thought," experts are permitted to "testify about what the factual record indicates" a party thought, or "testify about what a rational person or entity would do." *In re HIV Antitrust Litig.*, No. 19-CV-02573-EMC, 2023 WL 5670808, at *13 (N.D. Cal. Mar. 19, 2023). With this in mind, the Court will not exclude Opinion No. 4 on this basis, at this time, with the caveat that Defendants may object to any specific testimony that it believes crosses into improper state-of-mind. *In re Juul Labs, Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 19-MD-02913-WHO, 2022 WL 1814440, at *14 (N.D. Cal. June 2, 2022) (holding "[g]enerally, 'state of mind and intent' objections are better ruled on at trial: the context of the testimony and the purposes for which it is offered are critical").

Accordingly, Defendants' Motion to exclude Opinion No. 4 on these grounds is **DENIED.**

The Court agrees with Defendants, however, that Mr. Fujimoto's Opinion No. 4 contains impermissible legal conclusions. In particular, Mr. Fujimoto opines "the inclusion of the description of the secured nature of the debt was material to any potential investor

or investor in the Bermuda Fund." Fujimoto Rep. ¶ 51.  While expert testimony concerning an ultimate issue is not per se improper, "the Ninth Circuit Court of Appeals has said that an expert may not address whether certain facts mean a party has satisfied an element of the party's claim."  *IceMOS Tech. Corp. v. Omron Corp.*, No. CV-17-02575-PHX-JAT, 2019 WL 4750129, at * 11 (D. Ariz. Sept. 30, 2019) (first citing *Hangarter*, 373 F.3d at 1016–17; and then citing *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058–59 (9th Cir. 2008) (concluding that district court did not abuse its discretion in excluding portions of expert testimony that "label the parties' actions as 'wrongful' or 'intentional' under the law" because district court found that testimony stated a legal conclusion)).

Here, Mr. Fujimoto opines the alleged misstatements in the promissory notes regarding the secured nature of the debt, at issue in this case, were material, an element of the cause of action.  *See SEC v. Phan*, 500 F.3d 895, 907–08 (9th Cir. 2007) ("Section 17(a) of the 1933 Act, Section 10(b) of the 1934 Act, and Rule 10b-5 'forbid making [1] *a material misstatement or omission* [2] in connection with the offer or sale of a security [3] by means of interstate commerce." (emphasis added) (citation omitted)).  In doing so, unlike the expert in *Hangarter*, Mr. Fujimoto is not testifying about Defendants' deviation from an industry standard or referencing law that is ancillary to the ultimate issue, but testifying that certain facts mean the SEC has satisfied an element of their claim against Defendants.

At the hearing, the SEC's counsel argued the materiality of other statements is also at issue in this case, and as Opinion No. 4 only focuses on the materiality of the statements in the promissory notes, it does not improperly take the issue of materiality out of the hands of the jury.  The Court is unpersuaded.  Although it may be that Mr. Fujimoto does not opine as to the materiality of every alleged misstatement in this case, his opinion is still a legal conclusion as to the statements he references.  And the SEC does not argue, nor could it, that the materiality of the statements in the promissory notes is ancillary to the ultimate issue here.

Nor is the Court persuaded by the SEC's argument, made both at the hearing and in its Opposition, that this testimony is beneficial to the "average juror," Opp'n to Mot. to Excl. Fujimoto at 13, because testimony which concludes for the jury what result to reach, as Mr. Fujimoto does here, is unhelpful, *see, e.g., In re Apollo Grp. Inc. Secs. Litig.*, 527 F. Supp. 2d 957, 962 (D. Ariz. 2007) ("[E]xpert testimony that merely tells the jury what result to reach is inadmissible."); *see also United States v. Duncan,* 42 F.3d 97, 101 (2d Cir.1994) ("When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's.").

The SEC's counsel alternatively suggested that the Court's concerns could be addressed by permitting Mr. Fujimoto to use the word "important" rather than "material." Such suggestion is well-taken and was not opposed by Defendants' counsel at the hearing.

Accordingly, the Court **GRANTS** Defendants' Motion to exclude Mr. Fujimoto's testimony that the alleged misstatements were material to investors but will permit Mr. Fujimoto to testify to his opinion such statements were "important" to investors.

### 5. Conclusion

In sum, the Court **DENIES IN PART AND GRANTS IN PART** Defendants' Motion to exclude Mr. Fujimoto's testimony.  The Court **DENIES** Defendants' Motion to exclude Mr. Fujimoto as an expert witness entirely and **DENIES** Defendants' Motion to exclude Opinion Nos. 1 and 2.  However, the Court **GRANTS IN PART** Defendants' Motion as to Opinion No. 4 and precludes Mr. Fujimoto from testifying as to whether alleged misstatements were "material" to investors but permits Mr. Fujimoto to testify such statements were "important."  The Court **DENIES** the remainder of Defendants' Motion as to Opinion No. 4.

### B.    Motion to Exclude Testimony of Amy B. Hirsch

The SEC seeks to exclude testimony of Amy Hirsch ("Ms. Hirsch"), an expert witness for Defendants.  Ms. Hirsch is the Chief Information Officer ("CIO") and CEO of Paradigm Consulting Services, LLC, an "Alternative Investment Consultancy," which

provides advice and due diligence services to institutional investors. Report of Amy B. Hirsch ("Hirsch Rep.") at 3, ECF No. 51-7. She has been active in the financial industry since 1980, holding senior positions in brokerage firms, hedge fund consultancy, fund-of-funds, and a hedge fund. *Id.* at 7. She has conducted due diligence on hundreds of private funds, hedge funds, managed futures managers, absolute return funds, and private equity funds. *Id.* at 7–8.

The SEC contends the Court should bar or substantially limit Ms. Hirsch's offered opinions. In particular, the SEC argues specific opinions by Ms. Hirsch inappropriately testify as to Defendants' states of mind, and others wrongly invade the province of the jury and the Court. *See generally* Mot. to Excl. Hirsch. Additionally, the SEC argues Ms. Hirsch is unqualified to testify as to Defendants' failure to implement internal controls. *Id.*

### 1.    State of Mind Testimony

The SEC argues Ms. Hirsch's opinions that (1) Mr. Geiger and Ms. Ngo "inadvertently" included language stating the loans from the Bermuda Fund were secured; and (2) Mr. Geiger "interpreted" the ownership question in the Form ADV not as a number of shares or percentages owed, but rather as a matter of "control" from a portfolio perspective, should be excluded because they are impermissible opinions on Defendants' states of mind. Mot. to Excl. Hirsch at 6–7. The SEC asserts Ms. Hirsch is merely speculating as to Defendants' states of mind and opinions with respect to the subjective intentions of defendants are inappropriate. *Id.* at 7 (first citing *SEC v. Daifotis*, No. 11-00137 WHA, 2012 WL 2051193, at *2 (N.D. Cal. 2012); and then citing *SEC v. Retail Pro, Inc.*, No. 08-cv-1620-WQH-RBB, 2011 WL 589828, at * 6 (S.D. Cal, Feb 10, 2011)).

Defendants argue Ms. Hirsch does not offer opinion testimony on Defendants' states of mind, nor do Defendants intend to elicit any such testimony from Ms. Hirsch at trial. Opp'n to Mot. to Excl. Hirsch at 3. Instead, Defendants argue Ms. Hirsch states evidence in the factual record that she references in presenting her opinions. *Id.* at 3–4. For instance, when she uses the word "inadvertently" to describe the inclusion of language in the

promissory notes, Defendants argue she is permissibly noting testimony given by Defendants themselves. *Id.* at 4 (citing Declaration of She Hwea Ngo ("Ngo Decl."), Ex. A at 110:23–116:160, ECF No. 61-2). Similarly, Ms. Hirsch's reference to how Mr. Geiger "interpreted" the ownership question in the Form ADV, references Mr. Geiger's testimony. *Id.* (citing Geiger Decl., Ex. A at 158:3–17).

In its Reply, the SEC contends Ms. Hirsch did not "not[e] testimony given by the Defendants themselves" in her statements using the word "inadvertently," because Ms. Ngo's testimony cited by Defendants does not state that the secured statement was "inadvertently deleted" or that the statement "inadvertently" remained in the promissory notes. Reply to Mot. to Excl. Hirsch at 1–2. Accordingly, the SEC argues Ms. Hirsch's testimony is unsupported speculation as to what Defendants were thinking and is thus impermissible expert testimony. *Id.* at 2 (first citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994); and then citing *Al Otro Lada v. Mayorkas*, No. 17-cv-02366-BAS-KSC, 2021 WL 3929673, at *2–3 (S.D. Cal. Sept. 2, 2021)). The SEC responds as to Ms. Hirsch's opinion that Mr. Geiger "interpreted" the Form ADV, if she is just referencing statements Mr. Geiger made, that is simply narrative testimony. *Id.* at 3–4.

"Generally, 'state of mind and intent' objections are better ruled on at trial: the context of the testimony and the purposes for which it is offered are critical." *In re Juul Labs, Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2022 WL 1814440, at *14. Similarly, an objection to the narrative nature of testimony, "is properly asserted at trial . . . . [I]t is not a proper objection to an *expert report*, that, itself, will not be placed into evidence, nor to a *Daubert* challenge." *In re Actos (Pioglitazone) Prods. Liab. Litig.*, 2014 WL 120973, at *14 (emphasis in original); *see also Holley*, 2023 WL 2469632, at *6 (holding on a motion to exclude expert testimony that "whether narrative or summary testimony will be admitted at trial is 'context specific' and will be decided at a later date").

The Court **DENIES** the SEC's Motion to exclude Ms. Hirsch's testimony, at this juncture, as it is not clear what testimony Defendants intend to elicit from Ms. Hirsch, and

Defendants assert they do not intend to elicit testimony from Ms. Hirsch on Defendants' states of mind.  The Court notes that testimony as to Defendants' knowledge is likely relevant and admissible if there is a basis in the record for Ms. Hirsch to testify, such as her review of Defendants' documents or deposition testimony.  However, objections to testimony based solely on speculation about intent or state of mind may be made at trial and will be sustained where appropriate.

### 2.    Legal Conclusions

The SEC also argues Ms. Hirsch's statements that (1) actions taken by Mr. Geiger and Ms. Ngo in their operation of Cornerstone would not be "the behavior of someone seeking to systematically defraud . . . investors;" and (2) Mr. Geiger did not have a "'fraudulent' track record," are inadmissible legal conclusions.  Mot. to Excl. Hirsch at 7. Defendants respond that Ms. Hirsch's testimony about what was "not the behavior of someone seeking to systemically defraud . . . investors" was made in the context of her discussion of the investor letters that Cornerstone "sent to [its] investors frequently and on a consistent basis," which Ms. Hirsch found reflected a level of transparency that she notes was "not a common practice in the hedge fund / private fund industry."  Opp'n to Mot. to Exclude Hirsch at 5 (quoting Hirsch Rep. at 22).  Defendants contend Ms. Hirsch was comparing the facts of the case to industry standards, which is proper.  *Id.* (citing *Hangarter*, 373 F.3d at 1016–17).  Defendants assert Ms. Hirsch's opinion that Mr. Geiger did not have a "fraudulent track record" was made in the context of examples of "fraudulent track records" that she has seen in her experience in the private funds industry, and Defendants argue she should be allowed to testify to the hallmarks of fraud and note how Defendants' conduct differed.  *Id.* at 6–7.

The SEC responds in Reply that Ms. Hirsch may opine as to what is considered fraudulent conduct but should be precluded from opining on whether Defendants' conduct was consistent with non-fraudulent intent.  Reply to Mot. to Excl. Hirsch at 4.

The Court finds the admissibility of this testimony depends on the manner in which it is elicited and cannot be decided outside the context of trial.  Ms. Hirsch may compare

facts of the case to industry standards and testify as to "hallmarks" of fraud.  However, she may not "undertake[] to tell the jury what result to reach."  *See Diaz*, 876 F.3d at 1197. Accordingly, counsel are cautioned that although Ms. Hirsch will be permitted to present her opinions at trial if the questions are framed prudently, she may not invade the province of the jury to simply offer her opinion in place of theirs.

Accordingly, the Court **DENIES** the SEC's Motion, at this juncture, as to these opinions, without prejudice to the SEC's right to raise objections, if appropriate, at trial.

### 3.  *Section 206(4) Opinion*

The SEC also argues Ms. Hirsch is unqualified to opine about Section 206(4) as she stated in her deposition that she is "not an expert on that rule."  Mot. to Excl. Hirsch. at 8 (citing Deposition of Amy B. Hirsch ("Hirsch Dep.") at 100:11–13, ECF No. 51-8). Defendants agree Ms. Hirsch may not offer an opinion on whether Defendants violated Rule 206(4)-7.  But Defendants argue she does not need expertise on legal issues to opine on the efficacy of Cornerstone's internal valuation process and what would matter to investors about its valuation policies and procedures, because of her experience with private funds, hedge funds, and other funds.  Opp'n to Mot. to Excl. Hirsch at 7–8 (citing Hirsch Rep. at 24).  The SEC responds in Reply that Ms. Hirsch's opinion as to what investors cared about is irrelevant to a Rule 206(4)-7 claim, and the Court should exclude it.  Reply to Mot. to Excl. Hirsch at 5.

The Court finds Ms. Hirsch is qualified to opine on Cornerstone's internal valuation process and on what would matter to investors about its valuation policies and procedures based on her forty years "conduct[ing] due diligence on hundreds of private funds, hedge funds," and other funds.  Hirsch Rep. at 7.  However, the Court agrees with the SEC that Ms. Hirsch's testimony as to what investors cared about with respect to Cornerstone's policies and procedures is not relevant expert testimony, as it does not "logically advance" a material part of Defendants' case.  *See Messick v. Novartis Pharms. Corp.* 747 F.3d 1193, 1197 (9th Cir. 2014) (to be relevant, the proposed testimony must "logically advance[] a material aspect of the proposing party's case").

This is particularly true in light of the Court's finding, detailed below, that the SEC is entitled to summary judgment as to whether Defendant Cornerstone violated Section 206(4) and Rule 206(4)-7. The only remaining issue for trial relating to Section 206(4) and Rule 206(4)-7, regarding Cornerstone's written policies and procedures, is whether Mr. Geiger aided and abetted the violation, requiring a showing by the SEC of (1) a primary violation of the securities laws; (2) Mr. Geiger's "knowledge of the primary violation and of his or her own role in furthering it;" and (3) Mr. Geiger's "substantial assistance in the primary violation." *Ponce v. SEC,* 345 F.3d 722, 737 (9th Cir. 2003). Under the second prong, "[k]nowledge or recklessness must be established." *SEC v. Premier Holding Corp.,* No. CV18-00813-CJC(KESx), 2019 WL 8167920, at *6 (C.D. Cal. Dec. 10, 2019). The Court finds, to the extent Ms. Hirsch's testimony as to what investors would care about could have been relevant to an inquiry as to whether Defendant Cornerstone committed this violation, it no longer "has a valid connection to the pertinent inquiry." *Primiano,* 598 F.3d at 565. Accordingly, this testimony is excluded.

However, the Court finds Ms. Hirsch's testimony about the efficacy of Cornerstone's internal valuation is sufficient to satisfy the "low" relevancy bar, *see Messick*, 747 F.3d at 1196, as such testimony logically advances Defendants' contention Mr. Geiger acted in good faith, or at a minimum, that he lacked knowledge of or was not reckless in not realizing Cornerstone's violation and his own role in furthering it. Accordingly, the Court does not exclude Ms. Hirsch's testimony as to the efficacy of Cornerstone's internal valuation on this basis.

The SEC also argues Ms. Hirsch's opinion on this issue constitutes a legal conclusion that Defendants violated Section 206(4) and Rule 206(4)-7. Mot. to Excl. Hirsch at 8. Defendants respond that the SEC mischaracterizes Ms. Hirsch's opinion, as Ms. Hirsch did not testify as to whether Defendants violated these provisions. Opp'n to Mot. to Excl. Hirsch at 7. The Court agrees with Defendants, and the SEC appears to concede as much in its Reply, where it argues, "Hirsch's opinion . . . does not address Rule 206(4)-7's requirements." Reply to Mot. to Excl. Hirsch at 5. However, in any event,

testimony as to whether Defendant Cornerstone violated 206(4) and 206(4)-7 is excluded as irrelevant as the Court has found the SEC entitled to summary judgment on such issue.

Accordingly, the SEC's Motion to exclude Ms. Hirsch's opinion regarding Defendants' internal valuation system is **GRANTED IN PART AND DENIED IN PART**. The Court **DENIES** the SEC's Motion to exclude Ms. Hirsch's testimony as to the efficacy of Defendants' internal valuation system, as the Court finds her qualified to make such opinion and is otherwise assured the testimony is sufficiently reliable and relevant to satisfy the Court's "gatekeeping" function. However, the Court **GRANTS** the SEC's Motion to exclude Ms. Hirsch's testimony that written policies and procedures would not be relevant to investors, and Ms. Hirsch may not testify as to whether Defendants violated Section 206(4) and 206(4)-7.

> ### 4.    *Rebuttal Report*

Finally, the SEC seeks to exclude Ms. Hirsch's statement in her Rebuttal Report, "there is no evidence whatsoever that investors were taken advantage of or defrauded." Mot. to Excl. Hirsch at 9 (citing Supplemental Expert Report of Amy B. Hirsch ("Hirsch Rebut. Rep.") at 4, ECF No. 51-9).

Defendants respond that they will not elicit testimony from Ms. Hirsch regarding whether investors were defrauded. Opp'n to Mot. to Excl. Hirsch at 8. Defendants contend however, that it is appropriate for Ms. Hirsch to consider the benefits that investors enjoyed in the form of favorable returns and favorable treatment in reaching her opinions, as these do not reach the ultimate issue because the SEC is not required to prove reliance or actual harm. *Id.* In Reply, the SEC contends this testimony would simply provide a narrative of facts that other, percipient witnesses can testify to. Reply to Mot. to Excl. Hirsch at 6.

As Defendants represent they will not elicit testimony regarding whether investors were defrauded, and it is not clear what specific testimony Defendants intend to elicit, the Court **DENIES** this Motion at this juncture. As previously discussed, the Court will address any challenges to narrative testimony upon objection at trial. Counsel for Defendants are cautioned Ms. Hirsch may not "offer[] nothing more than a factual

narrative." *Johns v. Bayer Corp.*, No. 09CV1935 AJB DHB, 2013 WL 1498965, at *28 (S.D. Cal. Apr. 10, 2013).  However, at this time, the SEC does not argue, and the Court does not find, that Ms. Hirsch's rebuttal report is "merely facts," without any offered opinions, and accordingly, Ms. Hirsch's Rebuttal Report should not be excluded on this basis.  *See Est. of Cruz-Sanchez by & through Rivera*, 2019 WL 4450686, at *2 (holding an expert's opinion was not improper factual narrative because "[u]nlike the expert report in *Johns*, [2013 WL 1498965], where the report was merely facts, [the expert in this case] offers opinions as well as facts in his report").

### 5.    Conclusion

The Court **GRANTS IN PART AND DENIES IN PART** the SEC's Motion to Exclude Testimony of Ms. Hirsch (ECF No. 51) as follows.  The Court **DENIES** the SEC's Motion to bar Ms. Hirsch from testifying; **GRANTS** the Motion to exclude testimony that written policies and procedures would not be relevant to investors and testimony that Defendants violated Section 206(4) and 206(4)-7; and **DENIES** the Motion to exclude any other testimony.  The Court is otherwise assured that Ms. Hirsch's opinion rests on a reliable foundation and is relevant to the task at hand, satisfying the Court's "gatekeeping" obligation.

### C.    *Motion to Exclude Defendants' Purported Expert Testimony*

The SEC seeks to exclude purported expert testimony of all individuals disclosed by Defendants pursuant to Rule 26(a)(2)(A) and (B) of the Federal Rules of Civil Procedure, who did not provide expert reports.  Mot. to Excl. Hybrid Experts at 1.  The SEC argues these witnesses cannot serve as "hybrid" fact-expert witnesses pursuant to Fed. R. Civ. P. 26(a)(2)(C) because they were not properly labeled as such, they are not appropriate "hybrid" fact-expert witnesses, and further, their disclosures are insufficient under Fed. R. Civ. P. 26(a)(2)(C).  *Id.* at 2–7.  Defendants indicate in their Opposition that the only potential hybrid fact-expert witnesses are Derren L. Geiger, She Hwea Ngo, Grace Brescia, Jeffrey Rubinger, David Benz, and Steve Kennedy (collectively, the "Offered Witnesses"), and any other initially disclosed individuals will not provide expert testimony.

Opp'n to Mot. to Excl. Hybrid Experts at 2–3, 3 n.2.  Accordingly, the Court addresses whether these six Offered Witnesses should be excluded from providing expert testimony.

A party must disclose the identity of any expert witness they intend to use at trial. Fed. R. Civ. P. 26(a)(2)(A).  This disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony.  *Id.* 26(a)(2)(B).  However, if a witness is not required to submit a written report under Subsection (B), the disclosure "must state: (i) the subject matter on which the witness is expected to present evidence [ ]; and (ii) a summary of the facts and opinions to which the witness is expected to testify." *Id.* 26(a)(2)(C).

The party facing sanction has the burden of showing that any failure to disclose is substantially justified or harmless.  *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001).  The factors that may properly guide a court in determining whether a violation is substantially justified or harmless are: "(1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption of the trial; and (4) bad faith or willfulness involved in not timely disclosing the evidence."  *Manneh v. Inverness Med. Innovations*, *Inc.*, No. 08cv653 WQH (NLS), 2010 WL 3212129, at *2 (S.D. Cal. Aug. 12, 2010).

### 1.    *Disclosure Under Rules 26(a)(2)(A) and (B)*

The SEC first argues Defendants "specifically stated that they were designating [the Offered Witnesses] under Rules 26(a)(2)(A) and (B)" and thus the witnesses were required to provide a written report.  Mot. to Excl. Hybrid Experts at 2.  Because they failed to do so, the SEC contends none of these individuals can provide expert opinions.  *Id.* at 3.

Defendants respond that they captioned their Rule 26 Disclosure based on the language from the Court's February 9, 2024 Order that required each party to "comply with the disclosure provisions in Rule 26(a)(2)(A) and (B) of the Federal Rules of Civil

22-CV-765 JLS (VET)

Procedure." Opp'n to Mot. to Excl. Hybrid Experts at 1–2 (citing ECF No. 36). In their disclosure, Defendants listed their potential expert witnesses in two sections: (1) "RETAINED OR SPECIALLY EMPLOYED" and (2) "NONRETAINED OR SPECIALLY EMPLOYED," mirroring the language of Rule 26(a)(2)(C), and thus, according to Defendants, they "identif[ied] witnesses required to submit a written report pursuant to Rule 26(a)(2)(B), and those not required to submit a report pursuant to Rule 26(a)(2)(C)." *Id*. at 2 (citing Defendants' Rule 26(a)(2)(A)–(B) Disclosures "Rule 26 Disclosure" at 2, ECF No. 52-1). Defendants represent the "'RETAINED OR SPECIALLY EMPLOYED' section listed one witness, Amy B. Hirsch, whose report was provided to the SEC," and "the 'NON-RETAINED OR SPECIALLY EMPLOYED' section listed [the Offered Witnesses] and provided descriptions of the subject-matter on which each witness is expected to present expert testimony, and a summary of the facts and opinions to which they are expected to testify, as required by Rule 26(a)(2)(C)." *Id*. at 2–3 (citing Rule 26 Disclosure at 2–5).

Under the circumstances, the Court does not find it appropriate to preclude Defendants from offering any expert testimony from the Offered Witnesses because the title of their Rule 26 Disclosure did not specifically reference subsection (C) of Rule 26(a)(2). Rather the Court finds Defendants have shown any mislabeling in their Rule 26 Disclosure was harmless as Defendants listed their potential witnesses in two sections, "RETAINED OR SPECIALLY EMPLOYED" and "NON-RETAINED OR SPECIALLY EMPLOYED," thus identifying witnesses that were required to make a written report pursuant to Rule 26(a)(2)(B) and those not required to submit a report pursuant to Rule 26(a)(2)(C). The SEC does not appear to argue, and the Court does not find, that the SEC experienced prejudice because of this labeling, there is any likelihood of disruption of the trial, or that there was any bad faith or willfulness involved on Defendants' part.

Accordingly, the Court **DENIES** the SEC's Motion to exclude the Offered Witnesses from testifying as experts on this basis.

/ / /

1

2.    *Defendants Mr. Geiger and Ms. Ngo's Expert Testimony*

2    Next, the SEC argues "Defendants Geiger and Ngo—as parties to this litigation and

3    50% owners of Cornerstone—cannot provide expert testimony due to their intrinsic

4    financial interest in the outcome of the case."  Mot. to Excl. Hybrid Experts at 4.  The SEC

5    relies on *Perfect 10, Inc. v. Giganews, Inc.*, where the court exercised its "inherent power

6    to disqualify expert witnesses to protect the integrity of the adversary process . . . and

7    promote public confidence in the legal system[,]" to exclude purported expert testimony of

8    a party to the action who maintained a direct financial interest in the results of the litigation.

9    CV 11-07098-AB (SHx), 2014 WL 10894452, at *5 (C.D. Cal. Oct. 31, 2014) (quotation

10    omitted).

11    Defendants do not dispute Defendants Mr. Geiger and Ms. Ngo's direct financial

12    interest in the case, but rather argue that *Perfect 10* does not "stand for a categorical rule

13    that a financially interested party can never offer testimony."  Opp'n to Mot. to Excl.

14    Hybrid Experts at 7.  Defendants respond that Mr. Geiger and Ms. Ngo's years of

15    experience with the unique investments at issue constitutes "specialized knowledge" that

16    will help the jury "understand the evidence or to determine a fact in issue[,]" and concerns

17    about self-interest in the outcome of the case should be dealt with on cross-examination.

18    *Id.* at 8.  Defendants argue *Perfect 10* is distinguishable, as other courts have found, because

19    there, the court additionally noted its "skepticism that [the interested witness] qualifie[d]

20    as an expert for the purposes of th[e] litigation at all," and stated the witness "almost

21    certainly lack[ed] the specialized knowledge to qualify as an expert."  *Id.* at 7–8 (first

22    quoting *Perfect 10, Inc.,* 2014 WL 10894452, at *5; then citing *Maritech Marine Servs.,*

23    *LLC v. Bay Welding Servs., Inc.*, No. 3:20-CV-00231-SLG, 2022 WL 138677, at *2 (D.

24    Alaska Jan. 14, 2022); and then citing *Andover Healthcare, Inc. v. 3M Co.*,

25    No. CV 13-843-LPS, 2016 WL 6246360, at *7 (D. Del. Oct. 18, 2016)).  The SEC argues

26    the cases cited by Defendants should not be followed here, as in each, the proposed

27    witnesses, while employed at one of the parties, "were not named a named party and/or did

28    not have a direct financial interest."  Reply to Mot. to Excl. Hybrid Experts at 4.

At oral argument, Defendants' counsel suggested that the Court reserve ruling on this issue and consider it in the context of the evidence as it develops at trial, raising concerns that deciding the matter before trial could complicate the order of trial and the way evidence comes in.  Defendants' counsel contended it would be very difficult for Defendants Mr. Geiger and Ms. Ngo to "say anything without saying something that is not going to be particularly familiar to a juror" due to their specialized knowledge from their respective positions.  The SEC's counsel responded that Defendants Mr. Geiger and Ms. Ngo can of course testify as to what they did, they just may not provide expert opinions they did it correctly.

Considering the circumstances of this case, the circumstances presented in *Perfect 10, Inc.*, and the case law, the Court is persuaded that excluding Defendants Mr. Geiger and Ms. Ngo's *expert* testimony will advance the "policy objectives [of] preventing conflicts of interest and maintaining the integrity of the judicial process" without substantially burdening Defendants' "access to expert witnesses who possess specialized knowledge."  *Perfect 10*, 2014 WL 10894452, at 6; *see also Gately v. City of Port Hueneme*, No. CV16-4096-GW(JEMx), 2017 WL 8236269, at *13–14 (C.D. Cal. Oct. 2, 2017) (applying *Perfect 10* and excluding a plaintiff from testifying as an expert because he had "the only direct financial stake in the outcome of this litigation"); *IceMOS Tech. Corp.*, 2019 WL 4750129, at *8 (noting "an expert generally must be disqualified where the expert has a direct financial interest in the case beyond simply getting paid for rendering an expert opinion and testifying about it" (citing *Perfect 10, Inc.*, 2014 WL 10894452, at *4–6)).  In light of Defendants Mr. Geiger and Ms. Ngo's statuses as Parties, as well as their undisputed direct financial interest in the case, the Court finds "any semblance of independence or promise of intellectual rigor that normally adheres to an expert witness is fatally wounded . . . the conflict of interest is so great, and raises so many 'serious questions about the integrity of [the witnesses'] expert testimony,' that to admit the conflicted testimony would violate public policy."  *Perfect 10, Inc.*, 2014 WL 10894452, at *4 (quoting *Straughter v. Raymond,* No. CV 08-2170 CAS (CWx), 2011 WL 1789987 at *3

(C.D. Cal. May 9, 2011)).

Defendants Mr. Geiger and Ms. Ngo can of course testify as percipient witnesses, which can include testimony about their duties at Cornerstone, the operations of Cornerstone, and their understanding of applicable laws and regulations to explain their conduct and actions in this case. *See Gately*, 2017 WL 8236269, at \*14 (holding the interested witness could still testify as a percipient witness, "the Court rules only that Plaintiff will not be permitted to bolster his testimony with the aura of his own expertise").

Accordingly, the Court **GRANTS** the SEC's Motion and precludes Defendants Mr. Geiger and Ms. Ngo from testifying as experts.

### 3. *Disclosure Under Rule 26(a)(2)(C)*

Federal Rule of Civil Procedure 26(a)(2)(C) requires hybrid witnesses to disclose "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify."

As to the remaining Offered Witnesses, the SEC contends the "vague topic areas disclosed for the purported expert opinions are insufficient." Mot. to Excl Hybrid Experts at 4. The SEC asserts the disclosures do not identify any facts upon which their purported expert opinions rest and do not sufficiently disclose the potential opinions. *Id.*

Defendants argue their Rule 26 Disclosure describes the subject matter on which the witnesses are expected to present evidence, as required by 26(a)(2)(C)(i). Opp'n to Mot. to Excl. Hybrid Experts at 5. Next, Defendants argue the Rule 26 Disclosure summarizes the facts and opinions to which each witness is expected to testify, as required by 26(a)(2)(C)(ii), referencing the Rule 26 Disclosure as to Steve Kennedy ("Mr. Kennedy"), as an example, which states that he may testify that:

> (1) he reviewed Cornerstone and the Caritas funds in connection with the business relationship between Amegy Bank and Cornerstone; (2) based on the operative documents, no investor who reviewed or performed due diligence on Cornerstone or the

Caritas funds could have reasonably believed they were investing in a fixed-return asset or that the returns on their investment were not contingent on the performance of the oil and gas royalties held by American Assurance 2000; (3) no investor who reviewed or performed due diligence on Cornerstone or the Caritas funds could have reasonably believed that Caritas Bermuda's loans to American Assurance 2000 were secured by real property interests due to the absence of a mortgage deed of trust or any financing statement; (4) in the context of the energy industry and related lending operations, the word "collateral" is commonly used in a variety of contexts and does not necessary indicate that a particular asset is pledged as security; and (5) investors in the Caritas funds had sufficient opportunity to obtain information regarding the fund structure.

Rule 26 Disclosure ¶ 7(b).

Defendants argue their disclosures are sufficient, especially as Rule 26(a)(2)(C) does not require the extensive detail typically found in the report of a retained expert. *Id.* (citing *Cejas v. Paramo*, No. 14-CV-1923-JO-WVG, 2023 WL 2755117, at *2 (S.D. Cal. Mar. 31, 2023)). The SEC responds, also using the Rule 26 Disclosure as to Mr. Kennedy as an example, that this disclosure does not "provide (1) which documents, if any, Mr. Kennedy reviewed, and (2) which facts he relied upon in determining what investors 'understood' and the due diligence investors performed." Reply to Mot. to Excl. Hybrid Experts at 3.

The Court is not persuaded by the SEC's argument and finds the Offered Witnesses have sufficiently identified the subject matter for their opinions and summarized the facts and opinions in the Rule 26 Disclosure. While such disclosures may not include all the details desired by the SEC, "Rule 26(a)(2)(C) disclosures are considerably less extensive than those required for retained experts and courts must take care against requiring undue detail." *Cejas*, 2023 WL 2755117, at *2. The Court finds Defendants' Rule 26 Disclosure

22-CV-765 JLS (VET)

"include[ed] enough information to promote the goals underlying the rule: increasing efficiency and avoiding prejudicial surprise." *Green v. Qatar Airways Co.*, No. 2:19-cv-07950, 2020 WL 9601990, at * 2 (C.D. Cal. Nov. 13, 2020); *see also Gonzales v. Battelle Energy All., LLC*, No. 4:20-CV-00102-BLW, 2024 WL 3623363, at *4 (D. Idaho July 30, 2024) ("The law does not require [the defendant] to identify each component part of the opinions its [hybrid] experts will express. The law demands only a summary, and that is what [the defendant] has provided.").

Next, the SEC argues the Offered Witnesses' testimony goes beyond the typical bounds of "hybrid" fact-expert witnesses, noting that the Rule permitting such witnesses was "specifically designed with 'physical or other health care professionals' in mind." Mot. to Excl. Hybrid Experts at 5 (quoting Rule 26 Adv. Comm. Notes to 2010 Amendments). The SEC contends the "reasons for allowing [hybrid] witnesses to offer opinions without a typical report simply do not apply to the Offered Witnesses," as they are not the "typical treating physician" witness envisioned by Rule 26(a)(2)(C). *Id.*

The Court is, again, unpersuaded. As Defendants point out, physicians are not the only appropriate "hybrid" witness, and courts routinely allow non-physicians to testify as hybrid fact-expert witnesses. *See, e.g., United States v. Sierra Pac. Indus.*, No. CIV S-09-2445 KJM EFB, 2011 WL 2119078, at *4 (E.D. Cal. May 26, 2011) (holding investigators of a forest fire could testify as hybrid fact-expert witnesses); *Shenwick v. Twitter, Inc.*, No. 16-cv-05314-JST, 2021 WL 1232451, at *13–14 (N.D. Cal. Mar. 31, 2021) (holding founder of a technology research and advisory firm could testify as hybrid fact-expert witness). Further, while the treating physician may be the most common or paradigmatic "hybrid" witness, the SEC provides no authority for its contention that non-physician hybrid witnesses should be held to a higher disclosure standard than physician hybrid witnesses under Rule 26(a)(2)(C).

Finally, the SEC argues that if the Court finds the Offered Witnesses qualify as hybrid witnesses under Rule 26(a)(2)(C), the Court should still limit their testimony to their personal knowledge of this matter. Mot. to Excl. Hybrid Experts at 6 n.5. And the SEC

asserts Mr. Kennedy has failed to provide sufficient information "to even suggest he has 'personal knowledge' of Cornerstone and/or the Bermuda Fund." Reply to Mot. to Excl. Hybrid Experts at 4.

The Court agrees with the SEC's argument that the Offered Witnesses' testimony should be limited, at trial, to the personal knowledge they have based on their involvement in the events relevant to this lawsuit. *See Tarter v. Throne L. Off., P.C.*, CV 17-123-BLG-SPW, 2019 WL 609337, at *3 (D. Mont. Feb. 13, 2019) (holding a hybrid expert "do[es] not have carte blanch to testify at will as a hybrid/expert witness[ ], [he or she] must testify from the personal knowledge [he or she] gained from the job" (quoting *Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 371 (7th Cir. 2017))). However, the Court is not convinced, at present, that Mr. Kennedy has failed to provide sufficient information suggesting he has personal knowledge of Cornerstone and/or the Bermuda Fund. Upon the Court's review, it appears Mr. Kennedy, in his role at Amegy Bank, reviewed Cornerstone and the Caritas funds in connection with the business relationship between Amegy Bank and Cornerstone. Rule 26 Disclosure ¶ 7(b). Accordingly, he may testify to and opine on what he saw and did without the necessity of furnishing a written expert report. *See Goodman v. Staples The Off. Superstore, LLC*, 644 F.3d 817, 819 (9th Cir. 2011).

Accordingly, the Court **DENIES** the SEC's Motion as to exclusion of the remaining Offered Witnesses, Grace Brescia, Jeffrey Rubinger, David Benz, and Steve Kennedy. However, the Court **GRANTS** the Motion to the extent that the Offered Witnesses may only offer testimony based on their personal knowledge gained from the job or involvement in the events related to this lawsuit. Testimony outside those bounds is inadmissible because the witnesses would be acting as experts without complying with the relevant disclosures under Rule 26(a)(2)(B).[1]

---

[1] The Court does not reach the Parties' arguments as to whether the Rule 26 Disclosure, if found inadequate, would constitute harmless error, *see* Opp'n to Mot. to Excl. Hybrid Experts at 6–7; *see also* Reply to Mot. to Excl. Hybrid Experts at 5, as the Court finds such disclosure adequate.

### 4.    Conclusion

In sum, the Court **GRANTS IN PART AND DENIES IN PART** the SEC's Motion to Exclude Purported Expert Testimony (ECF No. 52).  The Court **GRANTS** the Motion and excludes Defendants Mr. Geiger and Ms. Ngo from providing expert testimony.  The Court **DENIES** the Motion as to the remaining Offered Witnesses—Grace Brescia, Jeffrey Rubinger, David Benz, and Steve Kennedy—but **GRANTS** the Motion to the extent that the Offered Witnesses may only offer hybrid fact-expert testimony based on their personal knowledge.

## MOTION FOR SUMMARY JUDGMENT

## I.    Legal Standard

Under Federal Rule of Civil Procedure 56(a), a party may move for summary judgment as to a claim or defense or part of a claim or defense.  Summary judgment is appropriate where the Court is satisfied that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Material facts are those that may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  When the Court considers the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party.  *Celotex*, 477 U.S. at 323.  The moving party may meet this burden by identifying the "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" that show an absence of dispute regarding a material fact.  *Id.*  When a plaintiff seeks summary judgment as to an element for which it bears the burden of proof, "it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."  *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton*

40

*v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

Once the moving party satisfies this initial burden, the nonmoving party must identify specific facts showing that there is a genuine dispute for trial. *Id.* at 324. This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts'" that would allow a reasonable fact finder to return a verdict for the non-moving party. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 248.

## II.    Analysis

The SEC seeks summary judgment as to liability on all of its claims against Defendants. *See generally* MSJ. The Court addresses each of these arguments in turn, in the order presented in the Parties' moving papers.

### A.    Section 17(a) of the Securities Act, Section 10b of the Exchange Act, and Rule 10-b

The SEC first argues Defendants violated the antifraud provisions of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

Section 17(a) of the Securities Act, Section 10(b) of the Securities Exchange Act, and Rule 10b-5 thereunder "forbid making [1] a material misstatement or omission [2] in connection with the offer or sale of a security [3] by means of interstate commerce. . . . Violations of Section 17(a)(1), Section 10(b) and Rule 10b-5 require *scienter*. . . . Violations of Sections 17(a)(2) and (3) require a showing of negligence." *Phan*, 500 F.3d at 907–08 (quoting *SEC v. Dain Rauscher*, 254 F.3d 852, 856 (9th Cir. 2001) (emphasis in original)).

/ / /

### 1.    Material Misstatement or Omission

The SEC argues Defendants made and disseminated material misstatements regarding (1) the security or collateral for the Bermuda Fund's loans and (2) the ownership of Cornerstone.  MSJ at 11–13.

"The standard of materiality is an objective one."  *United States v. Jenkins*, 633 F.3d 788, 802 (9th Cir. 2011) (citing *United States v. Reyes*, 577 F.3d 1069, 1076 (9th Cir. 2009)).  This standard will be "satisfied only if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'"  *Phan*, 500 F.3d at 908 (quoting *Basic v. Levinson*, 485 U.S. 224, 231–32 (1988)).  "Determining materiality in securities fraud cases 'should ordinarily be left to the trier of fact.'"  *Id.* (quoting *In re Apple Comput. Secs. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989)).  "Materiality typically cannot be determined as a matter of summary judgment because it depends on determining a hypothetical investor's reaction to the alleged misstatement."  *Id.*  Only if the established omissions are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality" is the ultimate issue of materiality appropriately resolved "as a matter of law by summary judgment."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)).

####        a.    Statements Regarding Security or Collateral for the Bermuda Fund Loans

The SEC points to the following statements as materially misleading. [2]  *See* MSJ at 12.

1.    Seventeen (17) promissory notes from April 1, 2011, through January 1, 2013, and again from November 1, 2014, through February 1, 2018, stated: "This Note is *secured*

---

[2] While the SEC notes other statements by Defendants made directly to the SEC and Cornerstone's auditor regarding the security of the loans in its Statement of Undisputed Facts, *see* MSJ at 6–7, the SEC does not appear to argue these statements were material under the relevant laws or regulations for which it seeks judgment, and accordingly, the Court does not address the materiality of such statements in its analysis.

by that certain Assignment and Pledge of Ownership Interests of even date herewith by and among Cornerstone Acquisition Management Company, LLC, as the Pledgor and the Payee [the Bermuda Fund], as the Secured Party." Promissory Notes at CS0000022522, 22524, 22526, 22528, 22532, 22540, 22542, 22544, 22546, 22550, 22548, 22552, 22560, 2384, 2380, 2382, 2376 (emphasis added).

2.    The Prospectus for the Bermuda Fund, dated April 1, 2011, stated, with respect to the loans memorialized by the promissory notes, that "there will be sufficient *security* for the debt (i.e., the membership interests in the Owner [American Assurance] will be pledged as *collateral* for the [Bermuda] Fund Loans)." Prospectus, Apr. 1, 2011, at CS0000024281, ECF No. 10 (emphasis added).

3.    The Bermuda Fund's financial statements for 2015 through 2018 stated that "the fair value of the [promissory] note receivable is influenced by the current market conditions surrounding the value of the *underlying collateral*." *See* Fin. Stmts. and Auditor's Rep. at SEC-CAMC-E-0002875, ECF No. 13 (emphasis added).

4.    On June 9, 2016, in response to a potential investor's questions, Mr. Geiger told the potential investor that the promissory notes were "*secured debt*." Email from Geiger to Gerwert, et al., June 9, 2016, at SEC-BMA-E-0002813, ECF No. 50-17; Geiger Dep. at 134:3–12 (emphasis added).

5.    On June 6, 2018, in response to an investor's questions, Mr. Geiger was copied on an email from Mr. Cox to the investor, who stated that the promissory notes were "*collateralized* by the underlying oil and gas assets." Email from Cox to Dudekin, et al., June 6, 2018, at CS0000015117 ECF No. 50-18 (emphasis added); Geiger Dep. at 131:21–132:11.

The SEC argues these misrepresentations were material because "[m]isrepresentations as to the use of investor funds are clearly material." MSJ at 12 (first quoting *SEC v. Advance Body Imaging LP*, No. SACV 07–1140 DOC (JTLx), 2009 WL 10673586, at *3 (C.D. Cal. Mar. 18, 2009); and then citing *SEC v. Sun Empire, LLC*, No. SACV 09-399 DOC (RNBx), 2010 WL 11506429, at *10 (C.D. Cal. Sept. 13,

2010)).  Additionally, the SEC asserts that "multiple courts have found statements that loans were secured—when in fact they were not—to be material as a matter of law."  *Id.* at 13 (first citing *SEC v. Loomis*, 969 F. Supp. 2d 1226, 1234 (E.D. Cal. 2013); then citing *SEC v. Small Bus. Cap. Corp.*, No. 5:12-CV-3237 EJD, 2013 WL 4455850, at *7 (N.D. Cal. Aug. 16, 2013); and then citing *SEC v. Milanowski*, No. 2:08-CV-00511-KJD-PAL, 2010 WL 11401596, at *11 (D. Nev. Mar. 15, 2010)).  Moreover, the SEC points out Mr. Geiger and Ms. Ngo testified that it was "important" for the Bermuda Fund's promissory notes, prospectus, and financial statements to be accurate.  *Id.*

Defendants argue there is a triable issue as to whether these alleged misstatements were material, considering that they were made over the course of more than ten years, many of the statements were in documents never "provided to investors or buried in a financial statement footnote," and at all times, the Bermuda Fund Prospectus—"the fund's primary disclosure document"—"always contained the accurate statement that the loan from the Bermuda Fund to [American Assurance] was 'unsecured.'"  MSJ Opp'n at 11.  Defendants assert the fact that they made "an accurate and truthful disclosure on the very issue the SEC alleges they misrepresented—clearly distinguishes this case from those cited by the SEC."  *Id.*

Defendants state that the April 2011 Prospectus, and every subsequent Prospectus contained the accurate statement that the loan from the Bermuda Fund to American Assurance was "unsecured."  *Id.*  Defendants assert further that, "beginning in July 2014, and in every subsequent version, the Prospectus stated in three places that the loans were 'unsecured,' including defining the term 'Fund Loan' as an 'unsecured intercompany loan.'"  *Id.* at 12 (citing Geiger Decl. ¶ 28).  Defendants indicate "all prospective Bermuda Fund investors were provided with the Prospectus and all investors were required to sign subscription documents certifying that they had reviewed the Prospectus."  *Id.* (citing Geiger Decl. ¶ 29; Geiger Decl. Ex. I).  Defendants argue, "[a]ll Bermuda investors and potential investors, thus were fully informed that the loan was unsecured."  *Id.*

Further, Defendants assert Cornerstone provided investors with a "wide range of

44

information regarding their investments, all of which made clear that Bermuda Fund's loan was unsecured. *Id.* (citing Geiger Decl. ¶¶ 31–36; Geiger Decl. Ex. C, ECF No. 59-4; Geiger Decl. Ex. J, ECF No. 59-11; Geiger Decl. Ex. K, ECF No. 59-12). For instance, Cornerstone provided its investors with regularly issued Due Diligence Questionnaires ("DDQs"), quarterly "Investor Letters," and monthly "Fact Sheets," all of which made clear that investors in the U.S. Fund and the Bermuda Fund were investing in the same assets: oil and gas minerals and royalties that were held by American Assurance, and that investors in both funds were exposed to the same risks of investing in oil and gas assets. Geiger Decl. ¶¶ 31–36. Mr. Geiger asserts that, as such, "no reasonably sophisticated Bermuda Fund investor could have possibly believed they were investing in secured debt or that the Promissory Notes were secured," because "[i]f that were the case, an investment in the Bermuda Fund would have been a fundamentally different investment in an entirely different asset class (with dramatically different levels of risk and potential returns) than an investment in the US Fund." *Id.* ¶ 36.

Accordingly, Defendants contend "there is at the very least a genuine issue of material fact as to whether any reasonable Bermuda Investor could have found a single contradictory word in a financial statement footnote (much less a Promissory Note they never saw) to affect the total mix of information available, which informed them that Bermuda loans were unsecured." MSJ Opp'n at 12.

As to the two instances of allegedly misleading communications between Cornerstone personnel and two individuals—one investor and one potential investor—Defendants argue the misstatements the SEC complains of were not material in the face of all the contradictory information that Cornerstone provided. *Id.* Additionally, Defendants argue neither the investor nor prospective investor allegedly receiving misstatements were misled. *Id.* With respect to the Bermuda Fund investor, he "certified that he had reviewed the Bermuda Fund Prospectus" and Defendants indicate he "received voluminous other materials provided by Cornerstone regarding the funds' structure, investment strategy, and returns which made clear the loan was unsecured." *Id.* at 13. Defendants contend "whether

a reasonable investor was misled by a single errant reference in an email, despite being fully informed of the truth by the fund offering documents at least 'requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts,'" *id.* (quoting *TSC Indus., Inc.*, 426 U.S. at 450), "which 'should ordinarily be left to the trier of fact,'" *id.* (quoting *Phan*, 500 F.3d at 908 (citation omitted)).

The SEC responds that "a truthful disclosure in one part of a prospectus does *not* allow an investment adviser to make other misrepresentations to investors" and argues Defendants do not "cite any case that would allow one truthful disclosure to immunize other false statements to investors." MSJ Reply at 3 (emphasis in original). Rather, the SEC contends, a "fundamental purpose" of the Advisers Act was "to achieve a high standard of business ethics in the securities industry." *Id.* (quoting *SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 186 (1963)). Further, the SEC argues the "subjective reactions of two investors do not save Defendants" as the SEC "need not show reliance" or harm to investors. *Id.* (first citing *Lorenzo v. SEC*, 587 U.S. 71, 84 (2019); and then citing *SEC v. RMR Asset Mgmt. Co.*, 479 F. Supp. 3d 923, 930 (S.D. Cal. 2020)). Additionally, the SEC contends the test for materiality is objective and courts have held misrepresentations about notes being secured were material as a matter of law. *Id.*

On summary judgment, the Court is not to weigh the evidence or make credibility determinations; rather, the Court must accept any reasonable inference that favors Defendants as the nonmovants. The Supreme Court has advised, as to materiality of misstatements in the securities context, "the underlying objective facts . . . will often be free from dispute," and are "merely the starting point for the ultimate determination of materiality." *TSC Indus.,* 426 U.S. at 450.

> The determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact. Only if the established omissions are so obviously important to

46

22-CV-765 JLS (VET)

> an investor, that reasonable minds cannot differ on the question
> of materiality is the ultimate issue of materiality appropriately
> resolved as a matter of law by summary judgment.

*Id.* Ultimately, "[d]etermining materiality in securities fraud cases 'should ordinarily be left to the trier of fact.'" *Phan*, 500 F.3d at 908 (quoting *In re Apple Comput. Secs. Litig.*, 886 F.2d at 1113).

Applying this standard, the Court finds whether Defendants made material misstatements of fact with respect to the security of the promissory notes is a question for resolution at trial. The Court is persuaded by Defendants' argument that Cornerstone's truthful disclosures and the context of the investment here distinguishes this case from SEC's cited cases where courts found statements regarding security of loans material as a matter of law. *See Loomis*, 969 F. Supp. 2d at 1234 (finding statement material where there was no argument of contradictory truthful disclosures); *Small Bus. Cap. Corp.*, 2013 WL 4455850, at *7 (same); *Milanowski*, 2010 WL 11401596, at *11 (same).

This does not require finding, as the SEC suggests, that "truthful disclosure[s] immunize other false statements to investors," MSJ Reply at 3, but rather that the statements are not "so obviously important" that reasonable minds could not differ as to the inferences a reasonable shareholder would draw from these facts.[3]

### b.    Statements Regarding the Ownership of Cornerstone

The SEC also argues Defendants made and disseminated false and misleading statements that Cornerstone was owned by Mr. Geiger, when in fact, "Geiger and Ngo each owned 50% of Cornerstone." MSJ at 13. The SEC argues these misrepresentations were material because Cornerstone's Form ADV, filed on March 8, 2018, stated that the company's recent "material changes" included "a change of ownership from D. Bruce

---

[3] At oral argument, the SEC's counsel reiterated the specific type of information at issue here, the security of the loans, has been found material as a matter of law by other courts. The Court does not disagree. However, as explained above, the Court finds this case significantly factually distinguishable from the authority cited by the SEC, and on the facts before it, does not find summary judgment appropriate here.

22-CV-765 JLS (VET)

McMahan (and his estate) to Derren L. Geiger." *Id.* Further, the SEC points to Mr. Geiger's testimony that Cornerstone's ownership "would certainly be material to somebody's investment choice." *Id.* Notably, however, the SEC does not cite any authority to support its position.

Defendants dispute the SEC's claim that the ownership disclosures in Cornerstone's Form ADV were inaccurate, and argue that Mr. Geiger and Ms. Ngo have testified that, at all times, they agreed Mr. Geiger would have full control and ownership of Cornerstone and that Ms. Ngo's interest would be limited to profit participation, consistent with how they disclosed the firm's ownership in the Form ADV. MSJ Opp'n at 13 (citing Geiger Decl. ¶¶ 45–47; Ngo Decl. ¶¶ 23–24).

Further, Defendants contend that even if Ms. Ngo was a "50% owner" of Cornerstone, the SEC provides no explanation or evidence for why the disclosure on Form ADV that Mr. Geiger was "75% or more" owner (rather than a between 50%-75% owner) and that Ms. Ngo owned "less than 5%" (rather than 50%) of Cornerstone was material. *Id.* at 13–14. Defendants point out both Mr. Geiger and Ms. Ngo were disclosed in the ADV. *Id.* at 14. Defendants argue that the SEC has not provided a basis to take away from the trier of fact the "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts." *Id.*

The SEC, in its Reply, argues Mr. Geiger and Ms. Ngo cannot use their supposed informal agreement to override the Purchase Agreement they signed, as such agreement expressly provides that it "constitutes the *sole and entire agreement* of the parties to this Agreement with respect to the subject matter contained herein, and *supersede[s] all prior and contemporaneous understandings and agreements*, both written and oral, with respect to such subject matter." MSJ Reply at 4 (quoting Purchase Agreement at CS0000007342) (emphasis in original). Additionally, the SEC points out that Defendants' argument does not address the statement on the Form ADV or Mr. Geiger's testimony that Cornerstone's ownership was "material." *Id*.

At the hearing, the SEC's counsel acknowledged it had not put forth any authority

that found similar statements to those at issue here material as a matter of law, but explained that, in its view, Defendants have admitted this information was material and accordingly the SEC is entitled to judgment.  Defendants' counsel responded that the SEC is conflating two different things, and Mr. Geiger never asserted the percentage of ownership in the company would be material.

Even so, as the SEC has emphasized, the standard for materiality is an objective one. *Jenkins*, 633 F.3d at 802 (citation omitted).  Thus, the entity's characterization on a disclosure form and what a CEO would find to be material are not conclusive as to the evaluation by a reasonable investor.  Ultimately, the SEC still does not explain, so the Court assumes it cannot explain, why the percentage of ownership disclosed regarding Mr. Geiger and Ms. Ngo "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'"  *Phan*, 500 F.3d at 908 (quotation omitted).  Much less, has it persuaded the Court it is entitled to judgment where such determinations "'should ordinarily be left to the trier of fact.'"  *Id.* (quotation omitted).

Although it may very well be that, in fact, the statement as to the percentage of Mr. Geiger's or Ms. Ngo's ownership was material, the Court finds this matter cannot appropriately be decided on the present summary judgment record.

As the Court finds the SEC is not entitled to summary judgment as to the materiality of the alleged misstatements, the Court does not reach Defendants' argument the statements were, in fact, accurate, based on Mr. Geiger and Ms. Ngo's informal understanding.

### 2. *Conclusion*

As the Court finds the SEC is not entitled to judgment as a matter of law as to whether the alleged misstatements were material, an element of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5, the Court **DENIES** the SEC's Motion for Summary Judgment as to its claims Defendants violated Section 17(a)

1  of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5.[4]

2      **B.    *Section 206(4) of the Advisers Act and Rule 206(4)-8, and Aiding and***

3  ***Abetting***

4      The SEC next argues that Cornerstone and Mr. Geiger, based on the same conduct

5  described above, violated Section 206(4) of the Advisors Act and Rule 206(4)-8

6  thereunder, and that Ms. Ngo aided and abetted those violations.  MSJ at 16–17.

7      "Section 206(4) and Rule 206(4)-8 prohibit an investment adviser to a pooled

8  investment vehicle from making an untrue or misleading statement or omission of material

9  fact to investors."  *SEC v. Molesky*, No. 2:21-cv-01065, 2021 WL 6752254, at *3 (C.D.

10 Cal. Oct. 21, 2021) (citing 15 U.S.C. § 80b-6(4); 17 C.F.R. § 275.206(4)-8(a)).  The

11 elements of these violations are "parallel" to those of the Exchange Act Section 10(b) and

12 Rule 10b-5.  *Id.* (citing *SEC v. Rana Rsch.*, 8 F.3d 1358, 1635 n.4 (9th Cir. 1993)).

13          *1.    Section 206(4) and Rule 206(4)-8*

14     As discussed above, the Court finds the SEC is not entitled to judgment as a matter

15 of law as to whether Defendants violated Section 17(a) of the Securities Act, Section 10(b)

16 of the Exchange Act, and Rule 10b-5.  As the elements of Section 206(4) and Rule 206(4)-8

17 are "parallel" to those of the Exchange Act Section 10(b) and Rule 10b-5, the Court

18 likewise finds the SEC is not entitled to judgment as a matter of law as to whether

19 Defendants Cornerstone and Mr. Geiger violated these provisions.

20     Accordingly, the Court **DENIES** the SEC's Motion for Summary Judgment as to its

21 claim Cornerstone and Mr. Geiger violated Section 206(4) of the Advisors Act and Rule

22 206(4)-8 thereunder.

23

24 _____

25 [4] Defendants also argue there is a genuine issue of material fact as to (1) whether Defendants' alleged
misstatements were made in the offer, purchase or sale of securities; (2) whether Defendants acted with
26 scienter; and (3) whether Defendants obtained money or property.  MSJ Opp'n at 14–17.  As the Court
finds the SEC is not entitled to judgment as a matter of law as to whether the alleged misstatements were
27 material, an element of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule
10b-5, the Court does not reach these arguments.
28

### 2.    Aiding and Abetting

To establish aiding and abetting liability, the SEC must establish "(1) a primary or independent securities violation committed by another party; (2) knowledge by the alleged aider and abettor of the primary violation and of his or her own role in furthering it; and (3) substantial assistance by the defendant in the commission of the primary violation." *SEC v. Sztrom*, 538 F. Supp. 3d 1050, 1062 (S.D. Cal. 2021) (first citing *Ponce*, 345 F.3d at 737; and then citing *SEC v. Fehn*, 97 F.3d 1276, 1288 (9th Cir. 1996)).

As a primary or independent securities violation by another party is an element the SEC must prove to establish aiding and abetting liability, and the Court finds the SEC is not entitled to summary judgment as to whether there was such a violation, the SEC is likewise not entitled to summary judgment as to its aiding and abetting claim against Ms. Ngo.  Accordingly, the Court **DENIES** the SEC's Motion for Summary Judgment as to its claim Ms. Ngo aided and abetted Section 206(4) and Rule 206(4)-8 violations.

### C.    Section 207 of the Advisers Act, and Aiding and Abetting

The SEC also argues Cornerstone and Mr. Geiger violated Section 207 of the Advisers Act, and that Ms. Ngo aided and abetted the violations.  MSJ at 18–20.

Section 207 of the Advisers Act makes it "unlawful for any person willfully to make any untrue statement of a material fact in any registration application or report filed with the [SEC] under section [203] or [204], or willfully to omit to state in any such application or report any material fact which is required to be stated therein."  15 U.S.C. § 80b-7; *see also SEC v. Cap. Cove Bancorp LLC*, No. 8:15-cv-980-JLS-JCx, 2016 WL 11752892, at *6 (C.D. Cal. Aug. 31, 2016).  This provision applies to Forms ADV.  *See Vernazza v. SEC*, 327 F.3d 851, 858 (9th Cir. 2003).

### 1.    Section 207

Similar to above, as materiality of the alleged misstatements regarding Mr. Geiger and Ms. Ngo's ownership shares is also an element of Section 207 liability, and the Court has found the materiality of such statements is an issue for the jury, the Court finds the SEC is not entitled to summary judgment as to whether Cornerstone and Mr. Geiger

violated Section 207 of the Advisers Act.  The Court **DENIES** the SEC's Motion for Summary Judgment as to its claim Cornerstone and Mr. Geiger violated Section 207 of the Advisers Act.

### 2.    Aiding and Abetting

Also as above, the Court **DENIES** the SEC's Motion for Summary Judgment as to its claim Ms. Ngo aided and abetted Section 207 violations, as a required element of such claim is a "primary violation." *Ponce,* 345 F.3d at 737.  Since the Court finds whether there was a primary violation to be an issue for the trier of fact, the SEC is not entitled to summary judgment as to its claim Ms. Ngo aided and abetted a primary violation.

### D.    Section 204 of the Advisers Act and Rule 204-2, and Aiding and Abetting

The SEC next contends it is entitled to judgment as a matter of law that Cornerstone violated Section 204 of the Advisers Act and Rule 204-2 thereunder, and that Ms. Ngo aided and abetted those violations.  MSJ at 20–21.

"Section 204 of the Advisers Act[] imposes recordkeeping and reporting requirements on registered investment advisers." *Sztrom,* 538 F. Supp. 3d at 1062.  Under Section 204 and Rule 204-2 thereunder, a registered investment adviser must "make and keep true, accurate and current" certain books and records relating to the advisers' investment advisory business.    17 C.F.R. § 275.204-2(a).    Specifically, Section 275.204-2(a)(2) requires advisers to keep "[g]eneral and auxiliary ledgers (or other comparable records) reflecting asset, liability, reserve, capital, income and expense accounts." *Id.* § 275.204-2(a)(2).  Additionally, Section 275.204-2(a)(10) requires advisers to keep "all written agreements (or copies thereof) entered into by the investment adviser with any client or otherwise relating to the business of such investment adviser as such." *Id.* § 275.204-2(a)(10).

### 1.    Section 204 and Rule 204-2

The SEC argues Cornerstone violated Section 204 and Rule 204-2, pointing to facts that Cornerstone was a registered investment advisor, and Ms. Ngo admitted that general ledger entries related to the purchase of Cornerstone were incorrect.  MSJ at 20 (citing

Cornerstone General Ledger, Jan. – Dec. 2018, at SEC-CAMC-E-0003709, -0003710; Ngo Dep. at 74:6–75:16); Ngo Inv. at 185:3–188:13 (purported $262,500 loans were "incorrect" and "just not the correct booking"); 195:14–196:4 ($90,000 entries were wrong, too . . . it's a series of incorrect mis [sic] entries"); 196:5–24 ($200,000 entries were also "incorrect entries")). Additionally, the SEC argues the promissory notes from American Assurance were kept as a part of Cornerstone's books and records, yet many of the notes were not accurate because they stated that they were secured when they were not and referenced an "Assignment and Pledge of Ownership Interests" that was never executed. *Id.* at 21 (citing Ngo Dep. at 46:1–13).

Defendants respond that they maintained all required books and records and engaged qualified third parties to provide accounting advice and conduct annual independent audits of the financial documents of each fund. MSJ Opp'n at 20. Defendants contend that, with respect to the entries in the ledger, Ms. Ngo acted in good faith, recording an unusual transaction to the best of her abilities. *Id.* Further, the ledger was a purely internal, bookkeeping system, which no one other than Ms. Ngo saw until the SEC investigation. *Id.* Defendants explain that while Ms. Ngo agreed that, with the benefit of hindsight, there was a better way to record these transactions, her entries were made in good faith and had absolutely no effect on any investor or on Cornerstone's activities, financial results, tax filings, or any other material matter. *Id.* Defendants also argue that the promissory notes were internal fund documents, not distributed or seen by investors. *Id.* at 21. Defendants contend the SEC provides no precedent that says an erroneous entry made in good faith, never seen by a third party and with no impact on any investor or the firm's operations constitutes a violation of federal securities laws. *Id.* at 20. Nor that an inaccurate statement in a purely internal document is a violation of federal securities laws. *Id.* at 21.

The SEC responds that Rule 204-2 does not merely require "maintaining" books and records, but that those books and records be "true, accurate and current," including the general ledger and written agreements. MSJ Reply at 9 (citing 17 C.F.R. §§ 275.204-2(a)(2) & (a)(10)). The SEC reiterates Ms. Ngo admitted the general ledger

was not accurate and that the promissory notes were not accurate. *Id.* Additionally, the SEC argues that good faith is irrelevant because there is no scienter required. *Id.* Further, the SEC contends there is no requirement that books and records be seen by a third party to violate the books and records provisions. *Id.*

The Court is not persuaded the SEC has demonstrated it is entitled to judgment as a matter of law. For one, the SEC's argument would have the Court construe Section 204 and Rule 204-2 to mean any inadvertent error whatsoever in an investment advisor's books and records would be a violation of a federal law. But the SEC's cited authority does not support such a construction of Section 204 and Rule 204-2, nor is the Court so convinced. Rather, the SEC's cited cases, and the Court's independent review of the case law reveals, in the instances where courts have dealt with Section 204 and Rule 204-2 claims, violations were found where the defendants failed to "make and keep" the records themselves. *See SEC v. Neman*, No. CV 12-03142-BRO (PLAx), 2016 WL 6661174, at *6 (C.D. Cal. July 15, 2016) (finding allegations defendant failed to maintain the required records stated a Section 204 and Rule 204-2 claim); *Sztrom,* 538 F. Supp. 3d at 1063 (holding plaintiff adequately alleged a violation of Section 204 and Rule 204-2 where defendant failed to preserve client communications); *SEC v. Gendreau & Assocs., Inc.*, No. CV093697JSTFMOX, 2010 WL 11508794, at *6 (C.D. Cal. Dec. 7, 2010) (granting summary judgment in favor of plaintiff for Section 204 and Rule 204-2 claim where defendant did not preserve documents created and sent by defendant to clients).

Indeed, the provision itself is predominantly a list of what types of records must be maintained, consisting of 25 categories, such as check books, bills or statements, and originals of all written communications received, and how long and in what manner such records should be kept. *See* 17 C.F.R. § 275.204-2. The Court recognizes the statute requires such records be accurate, and notes in one district court case outside of this circuit, *SEC v. Young*, No. 09-1634, 2011 WL 1376045, at *8 (E.D. Pa. Apr. 12, 2011), a defendant was found to have violated Section 204 and Rule 204-2 where he both admitted he failed to provide certain information to the SEC, and that the information he otherwise provided

was false and inaccurate.  However, the Court is not persuaded *Young*, nor Section 275.204-2 itself, establish the SEC is entitled to judgment as a matter of law here, where such judgment would be solely based on the existence of errors in Defendant Cornerstone's books and records.  Ultimately, the SEC's arguments have not demonstrated its entitlement to judgment as a matter of law, and as such, the SEC has failed to meet its burden and the Court **DENIES** the SEC's Motion as to Cornerstone's Section 204 and Rule 204-2 liability.[5]

### 2.    *Aiding and Abetting*

The Court **DENIES** the SEC's Motion for Summary Judgment as to its claim Ms. Ngo aided and abetted Section 204 and Rule 204-2 violations, as a required element of such claim is a "primary violation."  *Ponce,* 345 F.3d at 737.  Since the Court finds the SEC is not entitled to judgment as the primary violation, the SEC is not entitled to summary judgment as to its claim Ms. Ngo aided and abetted a primary violation.

### E.    *Section 206(4) of the Advisers Act and Rule 206(4)-7, and Aiding and Abetting*

Finally, the SEC argues it is entitled to judgment as a matter of law that Cornerstone violated Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder, and Mr. Geiger aided and abetted those violations.  MSJ at 21–23.

### 1.    *Section 206(4) and Rule 206(4)-7*

Under Rule 206(4)-7, investment advisors must "[a]dopt and implement written policies and procedures reasonably designed to prevent violation, by you and your supervised persons, of the Act and the rules that the Commission has adopted under the Act."  *SEC v. Tellone Mgmt. Grp.*, No. 821CV01413FWSADS, 2022 WL 18582314, at *15 (quoting 17 C.F.R. § 275.206(4)–7(a)).  "[S]cienter is not required under section 206(4)." *Id.* (citing *SEC v. Steadman*, 967 F.2d 636, 647 (D.C. Cir. 1992)).

---

[5] When asked at oral argument, the SEC's counsel did not provide any authority contemplating this rule in the manner suggested by the SEC.  Rather, the SEC's counsel reiterated the holding of *Young*, which, as explained, the Court does not find to be sufficient to support the SEC's present Motion.

1    The SEC contends when it began examining Cornerstone in July 2019, Cornerstone

2 had failed to adopt and implement written policies and procedures addressing compliance

3 risks relating to (i) short term loans made by Cornerstone to American Assurance; (ii) the

4 determination of interest rates for the promissory notes issued by American Assurance to

5 the Bermuda Fund; and (iii) the determination of principal adjustments for the promissory

6 notes issued by American Assurance to the Bermuda Fund.  MSJ at 22.

7    Further, the SEC asserts SEC staff notified Mr. Geiger of these issues in February

8 2020, and in March 2020, Mr. Geiger informed the SEC that Cornerstone had "adopted

9 and implemented" written policies and procedures for those processes.  *Id.*  These new

10 policies were designed to, among other things, ensure that information about Cornerstone's

11 related-party loans would be disclosed to investors in a timely manner, and that interest

12 rates and principal adjustments for the promissory notes to the Bermuda Fund, would be

13 established according to specific written procedures.  *Id.*  The SEC argues that because

14 Cornerstone was a registered investment advisor, but it lacked any written policies and

15 procedures for the three processes above until March 2020, Cornerstone violated the

16 Advisers Act Section 206(4) and Rule 206(4)-7 during the time before the written policies

17 and procedures were implemented.  *Id.*

18    Defendants respond that policies and procedures should take "into consideration the

19 nature of [the] firm's operations," that "smaller advisory firms . . . require much simpler

20 policies and procedures than larger firms," and that advisors are not required to

21 "consolidate all compliance policies and procedures into a single document . . . [or] to

22 memorialize every action that must be taken in order to remain in compliance with the

23 Advisers Act."  MSJ Opp'n at 21 (citing Compliance Programs of Investment Companies

24 and Investment Advisers, SEC Release No. 2204, 2003 WL 22971048, at *3–4 (Final Rule

25 Dec. 17, 2003)).

26    Defendants respond that Cornerstone's adoption and disclosure of new policies in

27 response to the SEC's examination was "mostly in the form of formalizing in Word

28 documents the policies and procedures that Cornerstone was already following."  *Id.* at 22.

Defendants argue Cornerstone applied consistent procedures before this formalization in Word documents, pointing to testimony that Mr. Geiger agreed to the statement "the interest rate, the return, was designed to make the offshore investor similar to the onshore investor, meaning the U.S. Fund[.]" *Id.* at 22 (citing Geiger Decl. Ex. B at 61:12–16, ECF No. 59-3). Defendants further claim the procedures applied to ensure the U.S. Fund and Bermuda Fund received similar returns were documented in writing in spreadsheets that Ms. Ngo maintained, pointing to testimony from Ms. Ngo that the interest rates were determined for each promissory note "based on a forecast of future cash flows," with one of the factors being "the forecast of the future cash flow at American Assurance," and that an Excel spreadsheet contained "calculations of how the interest rate was arrived," and a spreadsheet "calculate[d] what is the principal adjustment for each new note." *Id.* (citing Ngo Decl., Ex. B at 52:18–22, 90:12–24, 92:8–10, ECF No. 61-3). Additionally, Defendants cite to testimony from Mr. Geiger that a summary of the written policy did not exist but "written procedures were followed" because "[s]preadsheets existed . . . So written in terms of analysis[.]" *Id.* (citing Geiger Decl., Ex. B at 183:20–184:4, ECF No. 59-3). Defendants argue the recording of the loans in an Excel document is an appropriate written procedure given Cornerstone's size and operations. *Id.*

The SEC responds that tracking financial information in spreadsheets is insufficient because Rule 206(4)-7 requires the implementation of written policies and procedures. MSJ Reply at 10.

The Court agrees with the SEC and concludes that no reasonable juror could find Cornerstone's use of spreadsheets to calculate interest rates or principal adjustments constitutes a "written policy and procedure reasonably designed to prevent violation . . . of the Act[.]" 17 C.F.R. § 275.206(4)-7(a). While the Court recognizes Cornerstone may not need to "memorialize every action that must be taken in order to remain in compliance with the Advisers Act," *see* MSJ Opp'n at 21, Defendants have not met their shifted burden of identifying a genuine issue of material fact as to whether they memorialized, in the form of a written description, any aspect of addressing compliance risks relating to (i) short term

loans made by Cornerstone to American Assurance; (ii) the determination of interest rates for the promissory notes issued by American Assurance to the Bermuda Fund; and (iii) the determination of principal adjustments for the promissory notes issued by American Assurance to the Bermuda Fund.[6]  Accordingly, the Court **GRANTS** the SEC's Motion for Summary Judgment as to its claim Cornerstone violated Section 206(4) and Rule 206(4)-7 and **ENTERS** judgment in favor of the SEC on its claim against Cornerstone for violation of the Section 206(4) and Rule 206(4)-7, as to liability only.

### 2. Aiding and Abetting

To establish aiding and abetting liability, the SEC must establish "(1) a primary or independent securities violation committed by another party; (2) knowledge by the alleged aider and abettor of the primary violation and of his or her own role in furthering it; and (3) substantial assistance by the defendant in the commission of the primary violation." *Sztrom*, 538 F. Supp. 3d at 1062 (first citing *Ponce*, 345 F.3d 722 at 737; and then citing *Fehn*, 97 F.3d at 1288).  Under the second prong, "[k]nowledge or recklessness must be established." *Premier Holding Corp.*, 2019 WL 8167920, at *6.  Under the third prong, "[s]ubstantial assistance occurs when a defendant (1) associates himself or herself with the venture, (2) participates in it as in something that they wish to bring about, and (3) seeks to make the venture succeed by their action." *Id.* at *7.  "To prevail on this motion for summary judgment, the SEC—both the movant here and the party bearing the burden of proof at trial—must 'establish beyond controversy every essential element' of its aiding and abetting claims." *Id.* at *4 (citing *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003)).

As discussed above, the Court finds Cornerstone violated Section 206(4) and Rule 206(4)-7 thereunder.  However, "[e]stablishing that [a defendant] committed underlying

---

[6] Defendants' counsel additionally argued at the hearing that Defendants received written valuation reports from outside professionals.  However, Defendants' counsel did not argue such reports themselves constituted written policies or procedures and the Court is not persuaded the receipt of reports creates a genuine dispute of material fact as to whether Defendants maintained written policies and procedures.

violations is only the first element required to impose aiding and abetting liability on [a defendant]." *Premier Holding Corp.*, 2019 WL 8167920, at *6. The SEC also has the burden of proving Mr. Geiger knew or was reckless in not knowing about the underlying violations. *Id.* (citing *Ponce*, 345 F.3d at 737). With regard to this second element, "[i]t is not enough that the accused aider and abettor's action or omission is derived from inexcusable neglect." *Howard v. SEC*, 376 F.3d 1136, 1143 (D.C. Cir. 2004) (internal quotation omitted). "[A]iding and abetting liability cannot rest on the proposition that the person 'should have known' he was assisting violations of the securities laws." *Id.* Knowledge or recklessness must be established. *SEC v. Todd*, 642 F.3d 1207, 1225 (9th Cir. 2011) (denying defendants' motion for judgment as a matter of law on aiding and abetting claims because "a jury could reasonably conclude that [they] acted at least recklessly"). Reckless conduct is "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990).

The SEC argues Cornerstone committed the primary policy and procedure violation, Mr. Geiger knew of the violation, and substantially assisted in its commission, because he was Cornerstone's CCO and CEO; he was responsible for Cornerstone's compliance functions; and yet failed to ensure that the necessary policies and procedures were adopted and implemented. MSJ at 23.

Defendants respond that Mr. Geiger's Declaration demonstrates he acted in complete good faith, followed a robust and exhaustive process for valuing American Assurance's assets and setting the promissory note principal and interest rate values, disclosed the process to Cornerstone's auditors and external valuation consultant, and never once was advised that Cornerstone's internal controls or policies and procedures regarding these processes were insufficient. MSJ Opp'n at 23 (first citing Geiger Decl. ¶¶ 8–11, 18, 50–52; and then citing Rubinger Decl. ¶ 12).

In Reply, the SEC reiterates that as the Chief Compliance Officer, Mr. Geiger was responsible for legal compliance, including policies and procedures, and failed to ensure that written policies and procedures were adopted and implemented.  MSJ Reply at 10.

The Court finds Defendants have identified facts regarding Mr. Geiger's conduct such that reasonable minds could differ as to whether he engaged in an "extreme departure from the standards of ordinary care," in not recognizing Cornerstone's violations. Accordingly, the Court finds Defendants have met their shifted burden and identified a genuine issue of fact as to whether Mr. Geiger knew of or was reckless in not recognizing Cornerstone's Section 206(4) and Rule 206(4)-7 violations.

As the SEC is not entitled to summary judgment as to an element it must prove to find Mr. Geiger liable for aiding and abetting these violations, the Court **DENIES** the SEC's Motion for Summary Judgment as to its claim Mr. Geiger aided and abetted Cornerstone's Section 206(4) and Rule 206(4)-7 violations.

## CONCLUSION AND ORDERS

In light of the foregoing, the Court **GRANTS IN PART AND DENIES IN PART** the SEC's Motion for Summary Judgment (ECF No. 50).  Specifically, the Court **GRANTS** the Motion as to the SEC's claim Cornerstone violated Section 206(4) of the Advisers Act and Rule 206(4)-7 (Claim 5) and **ENTERS JUDGMENT** as to that claim, on liability only.  The Court **DENIES** the Motion as to the SEC's claims Defendants violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 (Claims 1 and 2); Cornerstone violated Section 204 of the Advisers Act and Rule 204-2 (Claim 3); Ms. Ngo aided and abetted Cornerstone's violation of Section 204 of the Advisers Act and Rule 204-2 (Claim 4); Mr. Geiger aided and abetted Cornerstone's violation of Section 206(4) of the Advisers Act and Rule 206(4)-7 (Claim 6); Cornerstone and Mr. Geiger violated Section 206(4) of the Advisers Act and Rule 206(4)-8 (Claim 7); Ms. Ngo aided and abetted Cornerstone and Mr. Geiger's violation of Section 206(4) and Rule 206(4)-8 (Claim 8); Cornerstone and Mr. Geiger violated Section 207 of the Advisers Act (Claim 9); and Ms. Ngo aided and abetted Cornerstone and Mr. Geiger's violation of

Section 207 (Claim 10).

Further, the Court **DENIES IN PART AND GRANTS IN PART** Defendants' Motion to Exclude Mr. Fujimoto's Testimony (ECF No. 49). Specifically, the Court **DENIES** Defendants' Motion to exclude Mr. Fujimoto as an expert witness entirely and **DENIES** Defendants' Motion to exclude Opinions No. 1 and 2. However, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion as to Opinion No. 4 and excludes Mr. Fujimoto's testimony that the alleged misstatements would be material to investors, with the caveat that Mr. Fujimoto may testify alleged misstatements would be "important" to investors.

The Court also **DENIES IN PART AND GRANTS IN PART** the SEC's Motion to Exclude Testimony of Ms. Hirsch (ECF No. 51) as follows. The Court **DENIES** the SEC's Motion to bar Ms. Hirsch from testifying; **GRANTS** the Motion to exclude testimony that written policies and procedures would not be relevant to investors and testimony that Defendants violated Section 206(4) and 206(4)-7; and **DENIES** the Motion to exclude any other testimony.

Finally, the Court **GRANTS IN PART AND DENIES IN PART** the SEC's Motion to Exclude Purported Expert Testimony (ECF No. 52). The Court **GRANTS** the Motion to exclude Defendants Mr. Geiger and Ms. Ngo from providing expert testimony. The Court **DENIES** the Motion to exclude all expert testimony from the remaining Offered Witnesses—Grace Brescia, Jeffrey Rubinger, David Benz, and Steve Kennedy—but **GRANTS** the Motion to the extent that the Offered Witnesses may only offer hybrid fact-expert testimony based on their personal knowledge.

In a prior Order, the Court vacated all pretrial dates, including the Pretrial Conference, pending resolution of the instant Motions. *See* ECF No. 53 at 2. Now that the Court has issued said decision, the Court **SETS** the following revised schedule of pretrial dates and deadlines:

/ / /

/ / /

| Event | Deadline |
|-------|----------|
| Memoranda of contentions of fact and law and any other action required by Civil Local Rule 16.1(f)(2) | February 20, 2025 |
| Comply with pretrial disclosure requirements of Federal Rule of Civil Procedure 26(a)(3) | February 20, 2025 |
| Meet and take any action required by Civil Local Rule 16.1(f)(4) | February 27, 2025 |
| Plaintiff to provide opposing counsel with proposed pretrial order for review and approval | March 6, 2025 |
| Lodge Proposed Final Pretrial Conference Order with the Court | March 13, 2025 |
| Final Pretrial Conference | March 20, 2025, at 1:30 p.m. |

**IT IS SO ORDERED.**

Dated:  January 23, 2025

*Janis L. Sammartino*
Hon. Janis L. Sammartino
United States District Judge

22-CV-765 JLS (VET)